**Northwestern Terra Cotta Corporation, an Illinois Corporation, Plaintiff-Appellee, v. Francis S. Wilson, Defendant-Appellant.**

**Gen. No. 51,183.**

First District, Fourth Division.

July 29, 1966.

Wayland B. Cedarquist, Thomas J. Boodell, Nunzio A. Giambalvo and Boodell, Sears, Foster, Sugrue & Crowley, of Chicago (Thomas J. Boodell, Jr., of counsel), for appellant.

W. McNeil Kennedy, Frank F. Fowle and Herbert S. Wander, of Chicago (Pope, Ballard, Uriell, Kennedy, Shepard & Fowle, of counsel), for appellee.

MR. PRESIDING JUSTICE DRUCKER delivered the opinion of the court.

Defendant appeals from an order temporarily restraining him from voting shares of stock in the plaintiff corporation of which he is a director.

Plaintiff (an Illinois corporation) brought an action against Francis S. Wilson and Earl Johnson, two of its directors, and alleged in its complaint (1) that the defendants purchased 24,164 shares of the plaintiff corporation in breach of their fiduciary duties as directors and (2) that the plaintiff will be irreparably damaged unless the defendants are temporarily restrained and enjoined from voting the aforesaid shares pending a final hearing. Plaintiff prayed that the court issue the preliminary injunction and also that the court enter an order requiring the defendants to convey the shares in question

to the plaintiff at the price for which they were purchased. After a hearing on the motion for the preliminary injunction the court entered an order that defendant Wilson be temporarily enjoined from voting 24,164 shares of stock of the plaintiff corporation,[1] from which defendant Wilson appeals. The aforesaid order also dismissed Earl Johnson as a defendant and no appeal has been taken from that part of the order.

Since Earl Johnson was dismissed, we must examine the complaint as it relates to the remaining defendant, Wilson. There is no denial of the allegations that the plaintiff, acting through its president, George L. Hudson, and Earl Johnson (a brother of Arnold Johnson, and a director and officer of plaintiff corporation) negotiated with the Continental Illinois National Bank and Trust Company of Chicago (hereinafter referred to as "Bank")[2] for the purchase of plaintiff's common stock and that on November 3, 1964, Hudson and Johnson formally offered $5 a share for 9,823 shares but that

---

[1] This litigation concerns 24,164 shares of stock purchased on July 13, 1965, by defendant and his associates. The evidence showed that the sale of 24,164 shares was negotiated by the defendant but that he actually purchased only 12,173 shares for himself. The names and interest of his associates were disclosed. However, the plaintiff asserted that while only 12,173 of those shares were registered in the name of the defendant, he (defendant) had placed the remaining shares beyond the reach of the court. Although no evidence was introduced to support this assertion, the trial court enjoined the defendant from voting not only the aforesaid 12,173 shares but also 11,991 additional shares owned by the defendant as a result of other purchases.

[2] The Bank was trustee under the will of Arnold Johnson of Trusts A and B consisting of 9,823 shares in plaintiff corporation. 15,000 other shares were bequeathed by Arnold Johnson to Carmen Johnson directly with which she established an inter vivos trust with the Bank as cotrustee in 1959. While the latter trust was subsequently revoked, the Bank had an understanding with Carmen Johnson that it would handle the shares along with those in Trusts A and B.

this offer was rejected. However, the following charges of the complaint were denied by defendant's answer: (1) that plaintiff continued to be interested in the purchase of 24,000 shares and that negotiations continued until July 1965; (2) that defendant was aware of said negotiations and participated in discussions with Hudson, wherein it was agreed that it would be advantageous to plaintiff to purchase said shares; (3) that in July 1965 the Bank, through Johnson, informed plaintiff that the Bank was willing to sell the 24,000 shares to plaintiff at $7 per share and defendant, knowing of plaintiff's continuing interest and ability to purchase said shares and in violation of his fiduciary obligation as a director, did not inform plaintiff of said offer but instead with others purchased the shares.

The court heard extensive testimony during the hearing on plaintiff's motion for a temporary injunction. George Hudson testified that on April 18, 1963, the Board of Directors authorized the purchase of 25,943 shares of the plaintiff's common stock at $4 per share; that the Bank rejected the plaintiff's offer to purchase the shares at that price; that the Board voted on February 26, 1964, to offer $4.50 per share for 25,000 shares; that Earl Johnson was instructed to convey the offer and to keep in touch with the Bank; that the offer was turned down; and that on November 3, 1964, plaintiff offered to purchase 9,823 shares from the Bank at $5 per share but this offer was also rejected. Hudson further stated:

> The Northwestern procedure as regards investments is that the investments are determined by the Executive Committee and after the Executive Committee decides to make an investment, every Director must approve of the investment. If any Director rejects the investment or vetoes, we do not go ahead and make the investment.

. . . . . .

41

Northwestern offered $4 a Share; then $4.50; and then $5. The price of $7 a Share for the 24,000 Shares at the Bank was never discussed by the Northwestern Board . . . . The Board never adopted a resolution authorizing the purchase of those Shares at $7 a Share. The purchase of those 24,000 Shares at $7 a Share was never discussed at any Meeting of the Northwestern Executive Committee. The Executive Committee never adopted a resolution authorizing the purchase at $7 a Share.

I came to a conclusion that Northwestern should purchase these Shares at $7 a Share when I discovered they had been purchased for $7. August 6, 1965 was the first date I knew the purchase had been made.

. . . . . .

I would reach such a conclusion from some Northwestern report. The last report preceding May was the one dated April 20, 1965. I may have based it on a report which I would figure out for myself from market quotations as to the Northwestern Holdings. I might have done this on May 5, 1965. Actually, I have picked the date of May 5, 1965 out of the air.

. . . . . .

After reaching my conclusion in the middle of May, 1965, I communicated it only to Earl Johnson. I told him that, in view of the increased value of the underlying stocks [owned by plaintiff], we probably should be setting a price of about $7 on any stock we buy in.

. . . . . .

After I reached my decision in May, 1965 that the Stock was worth $7, I did not communicate this to the Bank. I did consult with Mr. Lannan [a principal stockholder].

. . . . . .

I also communicated this conclusion to Mr. Wright [a director]. I also communicated it especially to Mr. Fox [then attorney for the corporation]. This was in May, 1965.

. . . . . .

I met with Johnson, Fox and Wright for lunch on May 10, 1965. Johnson said that the Bank was now valuing the Denver property [real estate owned by plaintiff] at $500,000. He also said that the Stock was currently trading at $6.50 or $7. We decided we should move our price up to $7 on any stock that was offered to the Corporation. Fox cautioned us against soliciting offers, "so it had to be offered to us before we could purchase it." We never received an offer from the Bank.

. . . . . .

Northwestern's cash position in the summer of 1965 was that it had somewhere between $25,000 and $35,000. If Northwestern had purchased the 24,000 Shares from the Bank and Carmen Johnson [widow of Arnold Johnson and owner of about 15,000 of the 24,164 shares in question], Northwestern would have had to sell some of its securities or obtain a loan. It is my judgment that a sale of any of its securities would not have been in the best interests of the Corporation.

. . . . . .

If any Shareholder had indicated his willingness to sell his Shares at $7 a Share, Northwestern would have bought. Johnson, Wright and Fox were aware of my conclusion. I never reported my conclusion to the Northwestern Board at any Meeting. Nor to the Executive Committee at any Meeting.

Leslie L. Reid, called as a witness by both plaintiff and defendant, stated that he is a vice president in the trust

43

department of the aforesaid Bank and that by early June of 1965 the Bank had been trying to sell the shares in question for about two or three years. He also stated that Hudson and Earl Johnson met with various bank personnel in November 1964 and that:

> We were dealing with the Northwestern offer of $5 a Share for the Shares held by the A and B Trusts [referring to the aforesaid 9,823 shares]. We said we could not accept an offer of $5 a Share.
>
> We named a price that we were willing to recommend. That price was $7 a Share.
>
> Mr. Hudson said Northwestern was not willing to pay $7 a Share; and, if we wanted $7, he didn't think we could get it from them.
>
> This related to just under 10,000 Shares in Trusts A and B; about 15,000 Shares held by Carmen Johnson, and about 2,700 Shares in some unrelated accounts.
>
> . . . . . .
>
> The next time I heard from Hudson, following the meeting of November 6, 1964, was about a year later, about November, 1965.
>
> . . . . . .
>
> With reference to my first meeting with Wilson in June 1965, just before that, I ran into him at the Bank and I told him we were hopeful we could sell the Shares to him. He had bought some other Northwestern Shares from the Bank, acting as Trustee. That earlier transaction was in April or May 1965. Wilson told me he paid $7.00 a Share in that earlier transaction. . . . That involved around 2,700 Shares.

In addition, three other officials of the Continental Bank who were present at the November 6 meeting

44

testified that Hudson rejected the figure of $7.00 per share.[3]

Earl Johnson, the erstwhile defendant, testified that:

I attended the Meeting at the Continental Bank on November 6, 1964. We met for the purpose of talking about the letter I had written to Mr. Reid and the reply, establishing the fact that Northwestern was offering $5 for the approximately 9,000 Shares in Trusts A and B. Mr. Reid said the $5 price was not acceptable but that if a $7 offer was presented, they would accept it. The Bank said this would also apply to the Carmen Johnson Shares and the other unrelated 2,700 Shares. Hudson thought we couldn't pay any more than $5 and he wouldn't go along on $7.

. . . . . .

We had a Northwestern Board Meeting the same day, after the Meeting at the Bank. We talked about the Meeting at the Bank. Hudson said $7 was too high and they wouldn't pay it.

This was again mentioned at a Board Meeting in April 1965. I wanted to know whether we couldn't raise our bid toward $7. But Hudson indicated that $5 was the maximum price they would go. Hudson took no action with regard to the $7 figure at any time after the Bank Meeting on November 6, 1964.

Defendant testified in his own behalf and stated:

I never participated in any of the talks or discussions which Earl Johnson or Hudson had with Reid or anyone else at the Continental Bank relating

---

[3] Hudson testified: "I did not say, at the Bank Meeting on November 6, 1964, that Northwestern would not pay $7."

45

to the Arnold Johnson Shares. I was aware that their talks were going on.

. . . . . .

I had nothing to do with the negotiations between Northwestern and the bank . . . .
I bought 2,700 Shares of Northwestern stock from the Bank in April, 1964 [sic (1965?)] at $7 a share.
Prior to the 2,700 Share purchase, I had owned some 2,200 Northwestern Shares for 10 or 12 years.

. . . . . .

Woolard & Company [of which defendant is a vice president] bought all 24,164 Shares on July 13, 1965, as Principal and immediately sold to members of the group [of which defendant was a member].[4]

 There is a general rule that a director of a corporation owes a duty to the corporation to take no advantage of his position for financial gain in derogation of the corporation's rights. Henry's Drive-In, Inc. v. Anderson, 37 Ill App2d 113, 185 NE2d 103. Whether in any case there is a duty upon a corporate official to refrain from purchasing property for himself depends upon whether the corporation has an interest, actual or in expectancy, in the property, or whether the purchase of the property by the officer or director may hinder or defeat the plans and purposes of the corporation in the carrying on or development of the legitimate business for which it was created. Turner v. American Metal Co., 268 App Div 239, 50 NYS2d 800; Boxrud v. Ronning Mach. Co., 217 Minn 518, 15 NW2d 112. Where there is no such duty the director of a corporation may acquire outside interests, although the corporation may be more or less interested. Fletcher Cyc Corp § 862

---

[4] Defendant testified that he received a total of 12,300 of those shares. He also identified the other recipients and the extent of their respective purchases.

46

(Perm Ed 1965). An opportunity may be embraced by a director as his own without accountability to the corporation if the corporation sought without success to obtain it. 19 Am Jur2d, Corporations, § 1313.

The overwhelming evidence in the instant case shows that on November 24, 1964, the plaintiff refused to pay $7 a share for the purchase of its stock and that the highest offer made by the plaintiff to the Bank was only $5. There is no proof that, as alleged in the complaint, defendant "participated in discussions with Hudson, wherein it was agreed that it would be advantageous to plaintiff to purchase said shares" [5] or that the Bank in July 1965 notified Johnson of its willingness to sell 24,000 of its shares to plaintiff at $7 (on June 24, 1965, the agreement for the sale of the stock was entered into between the Bank and the defendant—it was finalized on July 13) or that defendant knew of this purported offer and violated his duty to the corporation by not informing it of this purported offer and by buying some of the stock himself, knowing of such an offer. In his testimony Hudson stated his position to be that he had decided on May 10 that the corporation should pay $7 per share; that he did not communicate this to the Bank; that Fox (the then corporation attorney) advised him that the corporation "should never go out and make an offer to buy the shares."

However, on June 10, 1965, Fox, as attorney for plaintiff, wrote a shareholder in response to a suggestion that plaintiff buy his stock that plaintiff was not presently "redeeming" any of its shares. Defendant was aware of this letter shortly after June 10 having been shown a copy by Earl Johnson.

---

[5] Defendant testified: "My only expression at that Meeting [November 1964] or any other Meeting with reference to acquiring the Arnold Johnson Shares was that there was no corporate need for the Company to buy its own Stock but there was a need for them to conserve their funds to get in other businesses."

47

We find no support for plaintiff's claim that plaintiff was genuinely interested in acquiring its stock at $7 per share prior to the date defendant contracted to purchase the shares in question. At best, after May 10, 1965, it might have considered offers of stockholders who wished to sell their stock (although this is not borne out by its refusal of June 10, 1965) but even this so-called policy was never adopted by the stockholders, Board of Directors or even the Executive Committee.[6]

Plaintiff has cited a number of cases involving a director's usurpation of his corporation's opportunity to purchase shares of stock: Kelly v. 74 & 76 West Tremont Ave. Corp., 151 NYS2d 900; Ashman v. Miller, 101 F2d 85 (6th Cir) ; Bisbee v. Midland Linseed Products Co., 19 F2d 24 (8th Cir). We do not consider the corporate opportunity principle to be applicable to the facts of the case before us.

█ In Vulcanized Rubber & Plastics Co. v. Scheckter, 400 Pa 405, 162 A2d 400, the corporation sued some of its directors for purchasing some of its own stock in derogation of their fiduciary obligations as directors. The corporation had never adopted a resolution authorizing a purchase. The court held to be erroneous the entry of a temporary injunction enjoining the defendants from voting the shares in question. While in the instant case the corporation had authorized a purchase of 25,493 shares at $4 per share in 1963, of the same number of shares at $4.50 per share in February 1964 and 9,823 shares at $5 in November 1964, there was never any corporate action to purchase any shares at $7 per share.

---

[6] Subsequent to acquisition of the shares in question by defendant and others, plaintiff did purchase 3,104 shares at $7 per share on July 30, 1965, and 1,404 shares at $7.50 on November 18, 1965, but such purchases were never authorized by the Executive Committee or the Board.

The principle enunciated in Vulcanized at page 404 is applicable here:

> . . . [T]he complainant must establish that it is his clear legal right, not doubtful or uncertain, to the specific relief sought; otherwise the preliminary injunction will be dissolved. . . .

 Since under all the circumstances of the instant case we do not find that the evidence established a clear legal right, not doubtful or uncertain, to the specific relief sought, the order granting the preliminary injunction is reversed.

Reversed.

ENGLISH and McCORMICK, JJ., concur.