PATIENT CARE SERVICES, S.C., *et al.*, Plaintiffs-Appellants, *v.* MARSHALL B. SEGAL, M.D., *et al.*, Defendants-Appellees.

(No. 60415;

First District (3rd Division)—October 2, 1975.

William J. Stevens, of Foss, Schuman & Drake, of Chicago, for appellants.

Daniel Karlin, of Chicago, for appellees.

Mr. JUSTICE McNAMARA delivered the opinion of the court:

Plaintiffs, Patient Care Services, S.C. (hereinafter referred to as Patient Care), an Illinois professional service corporation, and David A. Martinez, M.D., one of its two officers and directors, filed a three-count complaint in the circuit court of Cook County against Medical Services, S.C. (hereinafter referred to as Medical Services), another Illinois professional service corporation, Marshall B. Segal, an officer and director of both of the above-named corporations, and Little Company of Mary Hospital, an Illinois corporation (hereinafter referred to as the hospital). The first count, sounding in equity, alleged that Segal violated his fiduciary duties owed to Patient Care by setting up a competing corporation while an officer and director of Patient Care and by seizing its business asset, requiring the court to impose a constructive trust upon the corporate funds of Segal and Medical Services and to order an accounting. The third count, sounding in law, charged Segal and Medical Services with interference of contract. The second count, which was directed against the hospital, was voluntarily withdrawn by plaintiffs prior to trial. The trial court severed counts one and three and ordered a trial to commence on count one. At the conclusion of all the evidence, the trial court, as trier of fact, entered judgment for defendants on not only count one but also on count three. This appeal follows.

We find the pertinent facts to be as follows. Both Martinez and Segal are licensed doctors in Illinois. Segal additionally is a licensed attorney in Wisconsin and California. During the latter part of 1970 and the early months of 1971, Martinez worked part time in the emergency room of Little Company of Mary Hospital in Evergreen Park, Illinois. During this time the acting administrator of the hospital approached him and inquired whether he would be interested in reorganizing the hospital's outpatient clinic and in assuming some staff responsibilities at the hospital. In April, 1971, Martinez met Segal while both were working at another hospital. Martinez subsequently discussed the proposition offered to him, and the two doctors outlined a program of comprehensive medical planning services which they would offer the hospital. A professional service corporation would be set up to handle the program. During the month of June, the two doctors met on several occasions with the hospital officials and discussed the basic features of this proposal. Essentially, a corporation would be set up by Martinez and Segal that would be responsible for scheduling doctors for the emergency room and out-patient

clinic of the hospital and for establishing health care planning. A written proposal was submitted by Segal and Martinez on June 10, and a costs proposal was forwarded to the hospital a few days later.

The parties orally agreed on the basic elements of the proposal and the program commenced on July 1. Patient Care was incorporated by Segal and Martinez in the latter part of June or beginning of July, 1971. Each doctor owned 50% of the corporate shares and became a director of the corporation. Segal was named president and Martinez secretary-treasurer.

A written agreement was never executed between Patient Care and the hospital. Proposed drafts were exchanged on a number of occasions, but at least at the initial stages differences regarding insurance, indemnity, and method of contract renewal precluded finalization of a contract. The hospital agreed to pay Patient Care $22.50 an hour for each hour a doctor employed by Patient Care worked in the emergency room. Additionally the hospital paid Patient Care $3800 a month for the health care planning preparation. Patient Care, in turn, paid the doctors employed by it $15 per hour for each hour of work in the emergency room, except for the two principals, who would each receive $21 per hour for this work. Segal and Martinez also drew monthly salaries of $4,000 each, and, subsequent to the commencement of their operation, the two principals agreed that the corporation would pay $185 per day to whichever one of them was in Chicago while the other was outside the city. During the year of its services at the hospital Segal received approximately $92,000 and Martinez $48,000.

Martinez testified that he made it clear in June, 1971, that he had been accepted at Harvard University some months earlier as a candidate for an advanced degree in public policy and that he would be in residence at Harvard for the first year of Patient Care's operation at the hospital. However, he stated at that time that he would commute to Chicago every second or third weekend as studies permitted. He expressed his belief that his studies would be useful in preparing long range health care plans, with most of the benefits accruing to the hospital upon his return from Harvard. Martinez testified that in the summer of 1971 he attempted to begin work on the health care planning, but was told by hospital officials to concentrate his efforts on more immediate problems with the new corporation.

In November Segal, bearing most of the administrative burden with Martinez away at Harvard, told Martinez he was unhappy with their financial arrangement. At the time the principals were drawing a monthly salary and getting paid for work either one performed in the emergency room. Martinez said that he eventually agreed on January 4, 1972, to

the aforementioned $185 per day plan. The agreement was made retroactive to July 1, 1971. Martinez testified that it was only after he signed that agreement that he was informed by Segal that the latter had been withdrawing money from the corporation according to the terms expressed in the agreement.

Martinez asserted that Segal's unhappiness continued even after execution of their agreement. In Martinez' opinion Segal's dissatisfaction stemmed from Segal's desire for additional compensation, from Martinez' absence from the city, and from the length of time it was taking Martinez to develop the planning services. On February 21, 1972, Segal wrote Martinez that he had concluded that their association had reached an impasse requiring its termination. Segal further stated that the corporation's arrangement with the hospital would end on June 30, 1972, and that unless Martinez agreed to sell his interest in the company Segal would take steps to dissolve it. On March 16 Segal's attorney wrote Norman Handelsman, Patient Care's attorney, a letter of similar import, adding that Segal intended to negotiate on his own behalf with the hospital and that he wished this information be conveyed to Martinez so that he could do likewise. Two weeks later, Martinez sent a letter to Segal. In it he stated that their differences could be resolved. However, he admonished Segal that any effort to negotiate on his own behalf with the hospital would constitute a breach of Segal's fiduciary duties to Patient Care and run the risk of a lawsuit. On April 3 Martinez met with Paul Wozniak, the executive vice-president of the hospital. At that meeting Wozniak purportedly told the doctor that he wanted a contract to be finalized between the parties to cover the current year operation so that a new one could then be prepared and presented to the hospital board of directors in June to continue Patient Care's program without interruption. Wozniak further related to Martinez that he had been informed that personal problems existed between Segal and Martinez. Martinez replied that such differences were insignificant. Wozniak responded that he hoped the differences could be resolved so that Patient Care's work could continue at the hospital. The hospital official closed the meeting by relaying to Martinez his understanding that Segal had set up his own corporation. This was the first time Martinez had been so informed.

Martinez' subsequent attempts to learn from Segal and Handelsman the status of the pending contract proposals were unsuccessful. On May 2 Timothy Toomey, the hospital's attorney, wrote Handelsman that the failure of the doctors to resolve their problems would in his opinion jeopardize the status of Patient Care and of the two doctors at the hospital and probably at other hospitals as well.

On June 15 Martinez sent a letter to Segal asking his intentions on

their future association. He further requested assurances on Segal's part that the quality and continuity of Patient Care's services would not suffer in the corporation's continued relationship with the hospital. In a meeting with Martinez and his attorney on June 19, Wozniak reported that Segal had expressed to him his desire to submit his own proposal for services at the hospital to commence July 1, 1972, to which Wozniak had replied he would consider proposals from both doctors. At the June 19 meeting Martinez responded that any proposal presented by him would be made on Patient Care's behalf only. Martinez then told Wozniak that he understood the hospital was inviting others to submit proposals. Wozniak sat back, laughed, and replied, "Oh, that is in Toomey's hands. Let him play it out. I get all the recommendations and forward them to the board, including his." The following day Segal wrote Martinez that the hospital would no longer negotiate with Patient Care and that their corporation would not be a viable entity after June 30, 1972. On June 21, Martinez presented a proposal to the hospital on behalf of the corporation. It was rejected later that month. Medical Services was hired on an interim basis which was continuing as of the date of trial.

Testifying as a witness under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1973, ch. 110, par. 60), Segal stated that even as of the date of trial he remained an officer, director, and shareholder of Patient Care. He further admitted that the oral contract Patient Care had with Little Company of Mary Hospital had been the sole asset of the corporation. He testified that his company, Medical Services, was performing substantially the same duties and maintaining the same type of daily corporate activities as had been done by Patient Care. While Segal asserted that at the time Medical Services was organized on March 9, 1972, he was retained only as a consultant, he was listed as one of that corporation's incorporators and he did subsequently purchase the organizer's interest in the corporation.

Segal stated that his relationship with Martinez was marked by a continual failure by Martinez to live up to their original oral understandings. According to the witness Martinez had promised to commute to Chicago weekly, to obtain credentials as a hospital staff member, and to make health planning studies. The failure of Martinez to conform to these understandings ultimately caused Segal in the beginning of 1972 to end his efforts to execute a contract between the hospital and Patient Care. He admitted writing Toomey on May 23, 1972, that his differences with Martinez were irreconcilable. Segal further testified that he met with Wozniak in the middle of June, 1972, at which time Wozniak informed him that he was not interested in any proposal from Patient Care to cover the next fiscal year. However, Wozniak indicated to him that he would

entertain individual proposals from the two doctors, and accordingly Segal prepared and submitted during the last week of June a proposal by him in the name of Medical Services for comprehensive medical services at the hospital, which subsequently was accepted on an "at will" basis.

Paul Wozniak testified that although no written contract was ever finalized with Patient Care, the hospital and the principals understood that the work agreement was to be for one year. One of the initial obstacles to execution of a contract was the respective parties' differences as to the type of option agreement which should be given the parties if satisfactory work was maintained for the initial year.

Wozniak related that in March, 1972, Segal and Martinez visited him on separate occasions and informed him that they would be "parting ways." Even up to the time of these disclosures, Wozniak was unaware of any impairment of services expended by Patient Care. Although the witness testified that the hospital would not enjoy a relationship with a medical corporation whose principals were at odds with one another, Wozniak asserted that even up to the middle of June, 1972, the hospital was satisfied with the services performed by Patient Care.

Wozniak testified that in early June he informed Segal that the latter could submit a proposal on his own behalf and that he would make the same opportunity available to Martinez. On June 28, Wozniak received a letter from Toomey recommending that the hospital retain Segal individually on a month-to-month basis for emergency room services until the resolution of the problems between the two principals or until a new contract was given to a different entity. On the following day Wozniak held a telephone meeting with several members of the hospital's board of directors, at the conclusion of which Toomey's suggestion was accepted. Consequently, Patient Care's relationship with the hospital ended effective July 1, 1972. Wozniak testified that up to that meeting no decision had been made as to Patient Care's continued status at the hospital.

On cross-examination, the witness testified that he received a letter dated June 2, 1972, from Toomey, which stated that Patient Care's desire to continue its relationship with the hospital was "ridiculous" due to the "obvious hostility" existing between Segal and Martinez and because of Toomey's fear of potential liability problems for the hospital. It was Toomey's recommendation that other groups be contacted to carry on the type of services performed by Patient Care. On June 21, Martinez wrote to Wozniak and attacked Toomey's position.

After the trial court denied defendants' motion for a directed verdict, defendants called Marshall Segal as a witness in his own behalf. Segal reiterated that Martinez' original agreement to commute weekly was

never met. Consequently the agreement was modified in their corporate attorney's office on October 29, 1971, whereby Martinez agreed to commute three out of every four weeks. Again this was not fulfilled. Segal also stated that Martinez had told him that he would obtain his Ph.D. degree after only one year at Harvard, which was not the case. The witness further alleged that Martinez hired a man to perform some of the health care planning assigned to Martinez without Segal's knowledge or approval. He also disputed Martinez' account of the origin of the special $185 a day agreement between the doctors, alleging that the agreement was orally entered into October, 1971, in their corporate attorney's office, although not executed in writing until January 4, 1972.

Segal conceded on cross-examination that he did nothing after March, 1972, to prompt the hospital to accept a contract with Patient Care.

Norman Handelsman corroborated Segal's account of the original commuting schedule agreed to by Martinez and Segal, as well as the date that the $185 a day agreement was orally agreed upon by them.

In ruling for defendants, the trial court accompanied its order with a number of findings of fact and conclusions of law. Among the conclusions of law specified by the court were that a two man professional service corporation must be regarded in the law as a joint venture rather than a corporation; that Segal's letter to Martinez in March, 1972, be deemed to constitute the former's resignation from Patient Care; that Martinez failed to abide by his agreement for services during the year of Patient Care's presence at the hospital; and that Segal violated no duty owed to Patient Care since no business opportunity existed for the corporation to exercise.

Plaintiffs contend on appeal that the trial court erred in refusing to find that Segal violated his fiduciary duty owed to Patient Care and in dismissing the third count of the complaint without a trial or hearing.

By necessity the resolution of the first point posed by plaintiffs involves the resolution of several other issues, namely whether a two man professional corporation is to be regarded ipso facto as a corporate facade; whether the officers and directors of such an entity owe any special duties to it; whether Segal's letter of March, 1972, is to be considered a valid and effective resignation from Patient Care by Segal; whether Segal violated any duties he may have owed to Patient Care; and whether a corporate opportunity existed for Patient Care which it was wrongfully deprived of exercising.

■■ The first two issues were resolved at oral argument and need not be considered by us in our analysis of this case. At oral argument defendants' attorney admitted that Patient Care is to be regarded and treated as a true corporation and that its officers and directors accordingly owe

to it a duty of loyalty and trust. We also can easily resolve the third issue posed. In our opinion Segal's letter of March, 1972, in no way constituted a valid and effective letter of resignation from Patient Care. (See *Raines v. Toney* (1958), 228 Ark. 1170, 313 S.W.2d 802.) Indeed, Segal's own conduct concedes this fact. At trial Segal admitted that he remained even at the time of trial an officer and director of Patient Care. He conducted the administrative affairs of the corporation up to the time Patient Care's services were terminated by the hospital effective July 1, 1972. Moreover, Segal testified that the reason that he did *not* resign prior to the termination of Patient Care's presence at Little Company of Mary was that he did not want the hospital to be totally deprived of any of the services he was helping supervise in the name of Patient Care. Thus the trial court erred in finding that Segal had effectively resigned in the early part of 1972.

■■ The duties that an officer or director owe to his corporation are so well established as to need no citation of authority to support them. They include the requirement of undivided, unselfish, and unqualified loyalty, of unceasing effort never to profit personally at corporate expense, of unbending disavowal of any opportunity which would permit the fiduciary's private interests to clash with those of his corporation. These duties are rooted not only in elementary rules of equity but also in business morality and public policy. (*Paulman v. Kritzer* (1966), 74 Ill.App.2d 284, 219 N.E.2d 541, *aff'd* (1967), 38 Ill.2d 101.) It therefore follows that an officer or director who strays from faithful adherence to these precepts and actively engages in a rival or competing business to the detriment of his corporation must answer to the corporation for the injury sustained. 3 Fletcher, Cyclopedia Corporations, ch. 11, § 856, at .215 (perm. ed. 1965).

■■ It must first be recognized that at least initially the finalization of a written contract to cover the first year of its operation of services at the hospital as well as the preparation and execution of a new one to embrace succeeding years constituted a corporate opportunity for Patient Care. Patient Care was organized for the purpose of providing comprehensive health services to a hospital. For the first year of its incorporation it was engaged in furnishing those services to the hospital, and the hospital was satisfied with those services. Obviously the very nature of its business necessitated a continuation and development of this relationship. (See *Kerrigan v. Unity Savings Ass'n* (1973), 11 Ill.App.3d 766, 297 N.E. 2d 699, *modified* (1974), 58 Ill.2d 20.) When such a corporate opportunity exists, it is inherent in an officer's or director's fiduciary obligations to refrain from purchasing property for himself in which the corporation has an interest, actual or expectant, or which may hinder or defeat the plans and purposes of the corporation in the carrying on or

development of the legitimate business for which it was created. *North-western Terra Cotta Corp. v. Wilson* (1966), 74 Ill.App.2d 38, 219 N.E. 2d 860; *Henry's Drive-In, Inc. v. Anderson* (1962), 37 Ill.App.2d 113, 185 N.E.2d 103.

Viewed in this light, this court finds it indisputable that Segal blatantly violated those duties of loyalty and trust which he owed to Patient Care. While an officer and director of that corporation, he helped set up and subsequently took over control of a different corporation organized to perform the very similar, if not identical, services Patient Care was organized to perform. Based upon various disagreements that he had with Martinez, his coofficer and codirector of Patient Care, Segal wrote Martinez in February, 1972, and announced his intention to terminate his association with Martinez. Segal testified that he was familiar with the contents of a letter written soon thereafter by his personally retained attorney to Patient Care's attorney that Segal was intent on negotiating on his own behalf to provide comprehensive medical services to the same hospital which was then under contract to Patient Care. Segal further admitted that it was around this time that he ceased any efforts to persuade the hospital to finalize a contract for the current and subsequent years with Patient Care. At that time Segal knew that Patient Care's contract with the hospital was the corporation's sole asset. When the first year of Patient Care's contract with the hospital concluded, Segal's new corporation, Medical Services, took over on a month-to-month basis. At the time of trial, almost a year after Medical Services had begun work at the hospital, Segal remained an officer and director of Patient Care.

The recital of these facts, all admitted by Segal, reveal a violation of his duties and loyalty to Patient Care. They not only signify a course of conduct bent on seizing his corporation's business but also evidence a willingness to destroy his corporation in the process.

■■ Segal's response is to point out alleged breaches of contract by Martinez and to argue that any continuation of his relationship with Martinez would have resulted in his peonage to Patient Care. The disagreements with Martinez would still not condone the actions taken by Segal vis-a-vis Patient Care. If Segal felt undercompensated or taken advantage of, he could have resigned from Patient Care. (See *Golden Rod Mining Co. v. Bukvich* (1939), 108 Mont. 569, 92 P.2d 316.) If he felt Martinez breached any contract with him and/or Patient Care, the proper recourse was, and is, for Segal to sue in the courts for breach of contract. Without so deciding, Segal may have been permitted, while retaining his positions in Patient Care, to organize another corporation and contract at hospitals other than the one Patient Care was under contract to perform. We merely hold he did not have the lawful right to

seize Patient Care's business while serving in his positions of trust with that corporation.

In another attempt to justify their conduct, defendants maintain that any apparent corporate opportunity Patient Care originally possessed terminated because of the occurrence of any one of three events.

■■ The first such happening is Segal's letter of February 21, 1972, to Martinez in which he stated that their association must terminate when Patient Care's contract with the hospital was supposed to end effective July 1, 1972. According to Segal, this letter effectively caused the corporation to cease to exist. This position has no basis in logic or equity. The fact that one's own conduct sounds the death knell for his corporation will not permit him to step in the breach unscathed.

Defendants next argue that a letter sent by Timothy Toomey, the hospital's lawyer, dated May 2, 1972, to Paul Wozniak, the hospital's vice-president, gives clear indication that Patient Care would no longer be wanted at the hospital after June 30, 1972. In this letter Toomey stated essentially that the hospital would be better served by the presence of a corporation whose principals were not antagonistic toward one another.

Toomey did not possess the ultimate authority at the hospital. He was merely one source of recommendations, which would be fed to Wozniak and ultimately the board of directors. According to Wozniak, a man who was obviously in a position to know, the hospital did not determine the fate of Patient Care until the telephonic board meeting on June 29, 1972. Moreover, by Wozniak's own testimony, he was satisfied with the services of Patient Care even as of the middle of June, 1972. We further must note that this letter from Toomey came many weeks after Segal had ceased any efforts on his part to maintain Patient Care's presence at the hospital. We finally are dubious over the legal conclusion defendants seek to draw from the May 2 letter, namely that the hospital, a third party, was in a position to effect a change in the time-honored obligations a fiduciary owes his corporation.

Defendants' third point under this argument is that Segal allegedly acted in good faith. This proposition is predicated on the recognition that Segal gave prior notice to Martinez of his intention to negotiate on his own behalf.

■■■ Defendants' case authority holding that a corporate officer or director violates his fiduciary duty to his corporation by failing to inform the corporation of a business opportunity he seized as his own has no applicability to the present case. The cases cannot be inverted to hold that once he gives notice he is ipso facto free to contest with the corporation the business opportunity. (See *Shlensky v. South Parkway Building Corp.* (1960), 19 Ill.2d 268, 166 N.E.2d 793.) In any event,

it is clear that the determination of good faith rests upon the existence of many factors of which disclosure is only one. In *Paulman v. Kritzer* (1966), 74 Ill.App.2d 284, 219 N.E.2d 541, this court stated what those factors are. In rejecting a claim that an officer/director had acted in good faith in purchasing on his own behalf property in which the corporation would have been interested, this court stated at pages 294-95:

> "Whether a corporate officer has seized a corporate opportunity for his own depends not on any single factor nor is it determined by any fixed standard. Numerous factors are to be weighed, including the manner in which the offer was communicated to the officer; the good faith of the officer; the use of corporate assets to acquire the opportunity; the financial ability of the corporation to acquire the opportunity; the degree of disclosure made to the corporation; the action taken by the corporation with reference thereto; and the need or interest of the corporation in the opportunity. These, as well as numerous other factors, are weighed in a given case. The presence or absence of any single factor is not determinative of the issue of corporate opportunity."

These principles were later held by our supreme court to a correct statement of the law in this State. (*Paulman v. Kritzer* (1967), 38 Ill.2d 101, 230 N.E.2d 262; *Vendo Company v. Stoner* (1974), 58 Ill.2d 289, 321 N.E.2d 1, *cert. denied* (1975), 420 U.S. 975, 43 L.Ed.2d 655, 95 S.Ct. 1398.) Disclosure would appear to have more significant weight in initially discovering whether a corporation would be interested in expanding its activities into an area which would appear to be profitable and naturally extensive. (See *Kerrigan v. Unity Savings Association* (1974), 58 Ill.2d 20, 317 N.E.2d 39.) However, where an officer or director, as here, desires to seize the only asset his financially solvent corporation presently possesses, when the corporation has manifested its desire to retain it, and when the corporation obviously needs to retain it, the mere fact that such officer and director has announced his intention in advance to throw down the gauntlet and do battle with his corporation over the opportunity will not constitute good faith. Under the test of *Paulman*, Segal did not act in good faith.

■■ We note in passing that it makes no difference whether or not the corporate opportunity seizure took place at Segal's personal behest or through the vehicle of Segal's corporation. (*Pepper v. Litton* (1939), 308 U.S. 295; *Shlensky v. South Parkway Building Corp.*) The proper remedy is for the court to impress a constructive trust on defendants and to order an accounting. *Henry's Drive-In, Inc. v. Anderson*; see *Golden Rod Mining Co. v. Bukvich*.

Defendants contend that even if they violated their legal responsibili-

ties in this matter plaintiffs should be denied relief on the basis of the unclean hands doctrine.

■■■ Although Martinez and Patient Care are both the named plaintiffs in the complaint, the suit is a stockholder's derivative suit, with Martinez the nominal plaintiff and Patient Care the real party in interest. The doctrine of unclean hands refers to a class of suitors which a court of equity will not listen to because the conduct of such suitors is itself unconscionable. (*Stevens-Davis Co. v. Mather & Co.* (1923), 230 Ill.App. 45.) While it is true that in a stockholder's derivative suit the cause of action belongs to the corporation, nevertheless it has been held that a finding of unclean hands on the part of the nominal plaintiff will bar judicial relief on the part of the corporation. (*Liken v. Shaffer* (N.D. Iowa 1946), 64 F.Supp. 432; 13 Fletcher, Cyclopedia Corporations, ch. 58, § 5887, at 234 (perm. ed. 1970).) The doctrine will only be applied where the alleged wilful misconduct on the part of the nominal plaintiff is connected to the matter in litigation and arises out of the transaction. *Stevens-Davis Co. v. Mather & Co.;* see *Mason v. Carrothers* (1909), 105 Me. 392, 74 A. 1030. See also *Korziuk v. Korziuk* (1958), 13 Ill.2d 238, 148 N.E.2d 727; *Evangeloff v. Evangeloff* (1949), 403 Ill. 118, 85 N.E.2d 709.

Defendants have criticized Martinez for failing to live up to certain agreements he allegedly had made with Segal. They claim, and the trial court so found, that Martinez did not adhere to certain commuting schedules, that he did not obtain hospital staff credentials, and that he did not adequately prepare health plans for the hospital. Defendants have cited other events that evidence unauthorized actions on Martinez' part, such as his retention of a consultant without Segal's knowledge or approval and his taking of a vacation without Segal's knowledge.

■■ The allegations by Segal do not approach the type of situation permitting the application of the unclean hands doctrine. The gist of the complaint is that defendants unlawfully seized Patient Care's business. The allegations are totally unconnected with the subject matter of the complaint. The record does not show that Martinez participated in, acquiesced in, or benefited by the conduct complained of. (Compare *Conners v. Conners Bros. Co.* (1913), 110 Me. 428, 86 A. 843; *Rosenfeld v. Zimmer* (1953), 116 Cal.App.2d 719, 254 P.2d 137.) Indeed Martinez strenuously objected to the actions taken by Segal. The mere fact that Martinez acted in such a way as to contribute to an unhappy employment environment for Segal which eventually prompted the latter to seize the corporate business is insufficient to justify defendants' conduct and to cause this court to apply the doctrine of unclean hands. (See generally *Vendo Company v. Stoner.*) Any wrong that Martinez may

have committed against Segal or the corporation may be redressed by a proper suit filed by Segal in court. It will not be cured in the manner advanced in this cause.

■■ Defendants finally contend that the complaint is deficient since it does not allege therein that the suit was instituted as a derivative stockholder's suit and that it was filed pursuant to a corporate resolution. Defendants raised these questions in their pretrial motion to strike and dismiss the complaint, which was denied by the trial court. Their election at that time to answer the averments in the complaint waived the issues for appellate review. *Cottrell v. Gerson* (1939), 371 Ill. 174, 20 N.E.2d 74.

Our resolution of this case renders unnecessary a consideration of the second issue raised by plaintiffs.

For all the reasons stated above, the judgment of the circuit court of Cook County is reversed and the cause remanded with directions to the court to impress a constructive trust on the business assets of defendants and to order an accounting in accordance with the views expressed in this opinion.

Judgment reversed and remanded with directions.

DEMPSEY and MEJDA, JJ., concur.