LINDENHURST DRUGS, INC., Plaintiff-Appellee, v. ALLEN BECKER, Defendant-Appellant (Allan Roberts, Inc., *et al.*, Defendants).

Second District   No. 2—86—0430

Opinion filed March 31, 1987.

Thomas P. Stepanich, Ltd., of Waukegan, for appellant.

Cary S. Fleischer, of Mass, Miller & Josephson, Ltd., of Chicago, and Adeline J. Geo-Karis, of Zion, for appellee.

JUSTICE REINHARD delivered the opinion of the court:

Plaintiff, Lindenhurst Drugs, Inc., filed a second amended six-count complaint seeking damages, a constructive trust, and an accounting against defendant, Allen Becker, and other defendants not parties to this appeal, arising out of defendant's purchase of a Ben Franklin store franchise to be used as a combination pharmacy-variety store while defendant was a shareholder, director, and officer of plaintiff, which operated a general pharmacy. Following a bench trial, the circuit court found for plaintiff on count I, which alleged that defendant violated a fiduciary duty by competing with plaintiff and failing to act for the benefit of plaintiff; on count II, which alleged that defendant usurped a corporate opportunity by purchasing the Ben Franklin store franchise for himself; and on count VI, which alleged that defendant misappropriated corporate assets for himself. The court ordered an accounting and created a constructive trust in favor of plaintiff, but denied plaintiff's prayer for punitive damages.

Our examination of defendant's brief indicates that the sole issue raised is whether the trial court's decision that he personally took advantage of a corporate opportunity in purchasing the Ben Franklin store franchise was against the manifest weight of the evidence. Defendant's principal argument is that the facts show that while the opportunity to buy the Ben Franklin store franchise was initially a corporate opportunity, plaintiff's failure to pursue the opportunity allowed him to obtain that opportunity for himself.

Initially, we point out that defendant has failed to address the trial court's decision on counts I and VI and has thereby waived review of any issue as to those counts. (103 Ill. 2d R. 341(e)(7); *Village of Crainville v. Argonaut Insurance Co.* (1980), 81 Ill. 2d 399, 405, 410 N.E.2d 5.) While defendant undertakes some minimal discussion of these counts in his reply brief, an argument not raised in the initial brief may not be raised in the reply brief and is waived for purposes of review. 103 Ill. 2d R. 341(e)(7); *Murdy v. Edgar* (1984), 103 Ill. 2d 384, 393, 469 N.E.2d 1085; *Village of Crainville v. Argonaut Insurance Co.* (1980), 81 Ill. 2d 399, 405, 410 N.E.2d 5.

We summarize the pertinent evidence at trial. The undisputed facts are as follows. Burton and Marvin Steinberg are brothers. Defendant began working for Marvin as a stock clerk or delivery boy around 1960 and later, in 1970, worked as a pharmacist at Northbrook Pharmacy, which was owned by both Burton and Marvin. Bur-

ton, Marvin, and defendant formed Lindenhurst Drugs, Inc., in 1971, with each of them owning one-third of the shares in the corporation. Each of them was also an officer and director of the corporation. The corporation then purchased a drugstore, called Lindenhurst Drugs, in the Linden Plaza Shopping Center. It entered into a lease with Allan Roberts, Inc., the owner of Linden Plaza Shopping Center, through its controlling shareholder, Morton Engel. The lease gave the corporation the exclusive right to operate a pharmacy in the shopping center and, by its terms, terminated December 31, 1981. The store contained about 5,000 square feet.

Burton, Marvin, and defendant agreed that defendant would manage the store and would be compensated by receiving a pharmacist's salary, other benefits, and 15% of the profits of the store. Defendant was in charge of general store operations, including hiring and firing employees, purchasing for the store, running sales, and negotiating with vendors. The store was successful and had gross yearly sales of around $758,000. The relationship between the shareholders was basically harmonious, although defendant did express some dissatisfaction with the business relationship in 1979 and asked Burton if he could buy out Burton's interest in the corporation sometime prior to 1980. Defendant was given an interest in several other pharmacies owned by Burton and Marvin, including a 10% interest in Palwaukee Drugs.

In mid-1979, defendant heard that the Ben Franklin store, located in the same shopping center as Lindenhurst Drugs, was for sale. That store had 15,000 square feet, as well as a 4,500-square-foot basement for storage. Defendant told Burton and Marvin that the store was for sale and arranged for a meeting with representatives of Ben Franklin at the store location. Defendant, Burton, and Marvin had previously been discussing the possibility of acquiring more space, and they thought it would be a good idea to explore the possibility of buying the Ben Franklin store franchise to make a Ben Franklin-Lindenhurst Drugs combination. At that time, City Products Corp., of which Ben Franklin is a division, was in charge of granting Ben Franklin franchises. The franchise on the Ben Franklin store at Linden Plaza Shopping Center was held by James Schmuck through his corporation, Fox Valley Hardware. The store was in poor financial shape and wasn't doing much business for a store of that size. The price James Schmuck was asking for his franchise was $30,000 for fixtures and 65% of the retail value of the inventory. Any offers made on the store, however, had to be made directly to City Products, who would relay the offer to James Schmuck to determine if the price was satisfactory. The buyer would also have to submit financial statements and

be approved as a franchisee by City Products.

Burton, Marvin, and defendant met with Morton Engel, who informed them that he would be willing to give them an exclusive right to operate a pharmacy at the Ben Franklin location, but also told them that they would still be responsible for the 2½ years remaining on their lease. At a meeting at City Products' office in July 1979, Burton and Marvin made an offer on the store, on behalf of Lindenhurst Drugs, of 60% of the actual wholesale cost of the inventory, or roughly 38% to 39% of retail cost, and nothing for the fixtures. Financial statements were not given to City Products. The offer was later rejected; however, Lindenhurst Drugs remained interested in purchasing the Ben Franklin store franchise. Burton spoke to Donald Erikson of City Products sometime in 1980 and discussed the possibility of Lindenhurst Drugs and the shopping center's liquor store sharing the space occupied by Ben Franklin, with the Ben Franklin store taking over Lindenhurst Drugs' space. At that time, Burton told Erikson that Lindenhurst Drugs still had an ongoing interest in purchasing the Ben Franklin store. Marvin attempted on many occasions to contact James Schmuck. Burton then told defendant in early 1981 to contact City Products and see what he could do. Defendant talked to Donald Erikson and asked him, on behalf of Lindenhurst Drugs, if anything was happening and was told no.

Engel informed defendant in June 1981 that Lindenhurst Drugs' lease would not be renewed. Defendant did not inform the Steinbergs at that time that the lease would not be renewed. Defendant began negotiations in July 1981 with City Products to purchase the Ben Franklin store franchise on his own. Defendant told Engel in June 1981 that he would be leaving the corporation and asked Engel if he would assign the exclusive right to operate a pharmacy in the shopping center to the Ben Franklin store, if defendant could reach an agreement with City Products. Engel agreed in the hope of having one strong store rather than two weak ones. Becker formed his own corporation, Linden Plaza Drug and Variety, Inc., on September 30, 1981, in order to purchase the franchise for the Ben Franklin store. His financing statements were submitted to City Products in August 1981, franchise agreements were signed on October 6, 1981, the agreement granting Ben Franklin the exclusive pharmacy right in the shopping center was signed November 5, 1981, a purchase and sales agreement in which defendant agreed to meet the price James Schmuck was asking was signed November 28, 1981, and the date of closing was January 6, 1982. Defendant did not inform Burton and Marvin that he was planning to leave the corporation or that he was

purchasing the Ben Franklin store franchise. When confronted by Burton and Marvin in November 1981, defendant told them that he didn't know whether he was buying the Ben Franklin store. Although defendant knew that the lease for Lindenhurst Drugs ended December 31, 1981, he didn't do anything to find a new space for the store.

Defendant removed $39,693.05 of inventory from Lindenhurst Drugs, taking the most saleable items. This inventory was eventually taken to the Ben Franklin store. He also removed some fixtures, one cash register, and patient profile cards, so that customers of Lindenhurst Drugs had to be sent to the Ben Franklin store to get their prescription information. Defendant did not have authorization from Burton or Marvin to remove anything from the store.

Several employees of Lindenhurst Drugs, including the only other pharmacist, Jim Pietryga, left Lindenhurst Drugs and began working for defendant at the Ben Franklin store. An advertising flyer was sent out from defendant's new store in 1982 which advertised that "Allen and Jim will be offering you the same quality Prescription Service that you have received for the last 10 years in Linden Plaza," referring to defendant and Jim Pietryga. Burton and Marvin fired defendant in early January 1982, after the inventory items were taken, and changed the locks on the store. Defendant was also removed as director and officer of the corporation although he is still a one-third shareholder. Lindenhurst Drugs was able to lease another location in the area, which had approximately 300 square feet, on January 15, 1982. The store had sales at that location of approximately $2,000 a month and went out of business the end of June 1982.

Other facts are in dispute. Defendant testified that he had expressed dissatisfaction with his association with Burton and Marvin as early as 1977. He testified that he was not involved in arriving at a price for an offer for the Ben Franklin store franchise in 1979. He stated that after he spoke to Donald Erikson from Ben Franklin in early 1981 and was told that nothing was going on, he conveyed this to Burton, who told defendant that he would have Marvin call. He also stated that he didn't know in 1981 whether Burton and Marvin were trying to find a new lease for the store.

Morton Engel was unable to testify at trial because he had suffered a stroke in August 1985 and his memory was impaired. However, pursuant to a motion, his March 8, 1982, deposition was read into the record at trial. In his deposition, Engel stated that Lindenhurst Drugs was a rundown, sloppy-looking store, that no capital improvements were made on the store, and that it was inadequate in size for a present-day drugstore. He stated that he had discussed with

Burton and Marvin the possibility of a larger space for the drugstore in the shopping center, but could not get a definite answer from them. He further stated that he told either Burton or Marvin around November 1981 that he would not be renewing the lease on the store because he was giving the pharmacy exclusive right to the Ben Franklin store and that the person he spoke to acted surprised.

Burton Steinberg testified that he, Marvin, defendant, and their accountant, Gerald Nechamkin, were involved in discussions regarding the corporation's offer to buy the Ben Franklin store franchise, and they all agreed on the amount of the offer. They decided on a low original offer because they had 2½ years left on their lease, they didn't think anyone else was interested, and the Ben Franklin store was not doing well, so they were in no hurry to enter into an agreement and thought they might be able to get a bargain. Burton also stated that defendant was in full control of Lindenhurst Drugs and that it was up to him to do whatever was necessary to see that the store was successful. He stated that he heard a rumor in September 1981 that the Ben Franklin store was being sold. He asked defendant about it, and defendant told him that he didn't know anything about it and that Ben Franklin wasn't interested in selling the store to Lindenhurst Drugs. Burton testified that defendant also told him at that time that there were 11 months to go on their lease so there was nothing to worry about. He stated that he told defendant to make sure and take care of it and negotiate a new lease for the corporation. Burton further testified that he and Marvin met with Engel around December 1, 1981, and that they were told that Engel wasn't going to renew the lease because he was giving the lease to the Ben Franklin store.

Marvin Steinberg testified that he and Burton visited Lindenhurst Drugs in late November 1981 and noticed that the inventory looked depleted. They met with defendant several days later, and defendant informed them for the first time that Engel was not going to renew the lease. Marvin stated that he had not made any further offers on the Ben Franklin store after the first offer was rejected because the responsibility had been delegated to defendant. Defendant told him he had been unsuccessful in getting in touch with anyone from Ben Franklin.

Gerald Nechamkin, accountant for Lindenhurst Drugs and also for defendant's new corporation, testified that he was involved in 1979 in discussions with Burton, Marvin, and defendant regarding the possibility of buying the Ben Franklin store franchise and the price that should be offered for the store. He stated that he had continuing con-

versations with them about the possibility of acquiring the store and that no one ever told him that they had abandoned their interest in the Ben Franklin store. Donald Erikson of City Products testified that he believed he had told James Schmuck that the offer made by Burton Steinberg wasn't even in the ball park, but that he was not aware of any discussions at City Products regarding a refusal to deal with Burton or Marvin. Jim Peitryga testified that approximately one-half of the customers of defendant's Ben Franklin store had previously been customers of Lindenhurst Drugs.

In a written order, the trial court found that no conspiracy was proved and entered judgment for defendants Becker, Engel, and Allan Roberts, Inc., on the conspiracy counts. The court entered judgment against defendant, however, on three counts of the complaint, finding that defendant breached his fiduciary duties as an officer and director of Lindenhurst Drugs by purchasing the Ben Franklin store franchise and operating a pharmacy in the store in competition with and to the detriment of plaintiff. The court also found that defendant breached his fiduciary duties by purchasing the Ben Franklin store franchise for himself, usurping a corporate opportunity rightfully belonging to plaintiff. Finally, the court found that defendant misappropriated corporate assets consisting of various items of inventory. The court ordered an accounting and an imposition of a constructive trust on behalf of plaintiff on the Ben Franklin store and any profits derived by defendant as a result of his breach of fiduciary duties including profits derived from the misappropriated assets.

■■ ■ The only issue preserved for review is whether the trial court's finding that defendant usurped a corporate opportunity is against the manifest weight of the evidence. Defendant does not deny that the opportunity to purchase the Ben Franklin store franchise was initially a corporate opportunity, but contends that this later became an individual opportunity because of plaintiff's failure to pursue the opportunity.

The corporate opportunity doctrine prohibits a corporation's fiduciary from taking advantage of business opportunities which are considered as "belonging," as far as the fiduciary is concerned, to the corporation. (*Graham v. Mimms* (1982), 111 Ill. App. 3d 751, 762, 444 N.E.2d 549; *Paulman v. Kritzer* (1966), 74 Ill. App. 2d 284, 289-92, 219 N.E.2d 541, *aff'd* (1967), 38 Ill. 2d 101, 230 N.E.2d 262.) A corporate opportunity exists when a proposed activity is reasonably incident to the corporation's present or prospective business and is one in which the corporation has the capacity to engage. *Peterson Welding Supply Co. v. Cryogas Products, Inc.* (1984), 126 Ill. App. 3d 759,

764, 467 N.E.2d 1068; see also *Kerrigan v. Unity Savings Association* (1974), 58 Ill. 2d 20, 27-28, 317 N.E.2d 39.

██ In determining whether an officer may take advantage of a business opportunity in which a corporation is interested, courts consider whether the corporation had an interest, actual or in expectancy, in the opportunity and whether the acquisition thereof by the officer would hinder or defeat plans and purposes of the corporation in carrying on or developing the legitimate business for which it was created. (*Comedy Cottage, Inc. v. Berk* (1986), 145 Ill. App. 3d 355, 360, 495 N.E.2d 1006; *Northwestern Terra Cotta Corp. v. Wilson* (1966), 74 Ill. App. 2d 38, 46, 219 N.E.2d 860.) Factors to be weighed in making the determination include the manner in which the offer was communicated to the officer, the good faith of the officer, the use of corporate assets to acquire the opportunity, the financial ability of the corporation to acquire the opportunity, the degree of disclosure made to the corporation, the action taken by the corporation with reference thereto, and the need or interest of the corporation in the opportunity. (*Paulman v. Kritzer* (1966), 74 Ill. App. 2d 284, 294-95, 219 N.E.2d 541, *aff'd* (1967), 38 Ill. 2d 101, 230 N.E.2d 262.) A reviewing court will not disturb the determination of the trial court unless it is against the manifest weight of the evidence. (*Peterson Welding Supply Co. v. Cryogas Products, Inc.* (1984), 126 Ill. App. 3d 759, 764, 467 N.E.2d 1068.) The trial court, in determining the weight to be afforded conflicting testimony, is in a far better position to determine the credibility of witnesses. *In re Marriage of Eltrevoog* (1982), 92 Ill. 2d 66, 71, 440 N.E.2d 840.

██ Here, the facts clearly show that the opportunity to purchase the Ben Franklin store franchise was one in which plaintiff was interested and had the financial ability to acquire, was reasonably incident to plaintiff's business, and could even be considered necessary to the continuation of plaintiff's business as its lease was not being renewed. The opportunity to buy the Ben Franklin store, therefore, was an opportunity belonging to the corporation. The supreme court has stated:

> "[I]f the doctrine of business opportunity is to possess any vitality, the corporation or association must be given the opportunity to decide, upon full disclosure of the pertinent facts, whether it wishes to enter into a business that is reasonably incident to its present or prospective operations. If directors fail to make such a disclosure and to tender the opportunity, the prophylactic purpose of the rule imposing a fiduciary obligation requires that the directors be foreclosed from exploiting that opportunity on their own behalf." *Kerrigan v. Unity Savings*

*Association* (1974), 58 Ill. 2d 20, 28, 317 N.E.2d 39.

Defendant, however, argues that he did disclose the opportunity to plaintiff and that plaintiff attempted to obtain the opportunity but failed by making a low initial offer and no further offers so that he was free to obtain the opportunity for himself. He relies on *Northwestern Terra Cotta Corp. v. Wilson* (1966), 74 Ill. App. 2d 38, 219 N.E.2d 860, which states, in pertinent part, that "[a]n opportunity may be embraced by a director as his own without accountability to the corporation if the corporation sought without success to obtain it," citing 19 Am. Jur. 2d *Corporations* sec. 1313. (74 Ill. App. 2d 38, 47, 219 N.E.2d 860.) In that case, a corporate director paid $7 per share for shares of his corporation's stock which his corporation had unsuccessfully sought to purchase for $5 per share. In an action by the corporation to prevent the director from voting his shares, no breach of fiduciary duty was found to have occurred because the court found no support for the claim that the corporation was interested in acquiring the stock for the higher price paid by the director. (74 Ill. App. 2d 38, 47-48, 219 N.E.2d 860.) There was testimony, in fact, that the board of directors of the corporation had determined that $7 was too high, and they couldn't pay it. 74 Ill. App. 2d 38, 45, 219 N.E.2d 860.

*Northwestern Terra Cotta* is factually distinguishable from the situation here and was recently distinguished by *Comedy Cottage, Inc. v. Berk* (1986), 145 Ill. App. 3d 355, 495 N.E.2d 1006, a case more similar to the instant case. In *Comedy Cottage*, the corporation operated a comedy club in Rosemont, Illinois. The general manager of the corporation, who was also an officer, acquired a lease to the premises after the corporation's lease had been terminated and established a rival club there. The trial court granted the corporation an injunction enjoining the officer from interfering with the corporation's possession of the premises, and the appellate court affirmed. The reviewing court found that the officer breached his fiduciary duties to the corporation as he was in charge of running the day-to-day operations of the corporation, was personally entrusted with the negotiations for the renewal of the lease and, when he received notice of termination of the corporation's lease, used the knowledge gained as a result of his position with the corporation as an opportunity to resign from the corporation and obtain a lease for himself without competition or disclosure. (145 Ill. App. 3d 355, 360-61, 495 N.E.2d 1006.) Although the officer had also argued that he was free to obtain the lease, even though the corporation was more or less interested in it, because the corporation had sought without success to obtain it, the court found circumstances

and reasons in *Northwestern Terra Cotta* distinguishable, as the corporation remained interested in the property acquired by its former officer and no evidence indicated that he acquired the lease for a higher price than the corporation was willing to pay. 145 Ill. App. 3d 355, 361, 495 N.E.2d 1006.

Here, it is undisputed that plaintiff remained interested in purchasing the Ben Franklin store franchise, and there was no evidence presented that plaintiff was unwilling to pay the price James Schmuck was asking for the franchise. Defendant argues that plaintiff's extremely low offer suggests that they were unwilling to pay a higher price. The testimony, however, indicated that the low offer was made because plaintiff was in no hurry to buy the store as it still had 2½ years left on its lease, and the directors didn't think anyone else was interested. In a revision of the Am. Jur. 2d section relied on in *Northwestern Terra Cotta*, it is stated that the corporation's unwillingness to take advantage of the opportunity in question must be clearly manifested. (18B Am. Jur. 2d *Corporations* sec. 1788 (1985).) There was no evidence presented here to indicate that plaintiff would not have met James Schmuck's asking price at the time defendant began negotiations on his own.

Similar to the facts of *Comedy Cottage*, defendant here was asked to negotiate on behalf of the corporation to obtain the Ben Franklin store franchise. Because of his position with the corporation, he learned that the corporation's lease would not be renewed. There was no testimony that defendant made a good-faith attempt to negotiate with City Products on behalf of the corporation. The testimony also showed that defendant did not inform Burton and Marvin that the lease would not be renewed until confronted in November 1981, although he was informed of this fact by Engel in June 1981. Also, it is unlikely that City Products would have negotiated with defendant if it weren't for his position at Lindenhurst Drugs. Defendant used the information he received and his position with the corporation to his own advantage and to the detriment of plaintiff. Use of a director's position with the corporation to capture an opportunity alone may be enough to establish liability. (*Kerrigan v. Unity Savings Association* (1974), 58 Ill. 2d 20, 29, 317 N.E.2d 39.) Under these circumstances, defendant cannot use the fact that he originally disclosed the opportunity to plaintiff, who then made a low initial offer, to excuse his breach of fiduciary duties in taking the opportunity for himself.

■ Defendant also argues that Burton and Marvin "reaped exactly what they sowed," contending that they did not actively pursue the opportunity to purchase the Ben Franklin store franchise and that

it was their dealings with Engel which caused him to decide not to renew the lease. The testimony at trial, however, showed that defendant was in charge of managing the store and indicated that he had the responsibility for renewing the lease. Testimony also showed that he was asked by Burton to try to negotiate for the purchase of the Ben Franklin store franchise on behalf of the corporation. Based on these facts, defendant's fiduciary duties to the corporation required him to promptly inform the other directors that the lease was not being renewed (see *Unichem Corp. v. Gurtler* (1986), 148 Ill. App. 3d 284, 291, 498 N.E.2d 724) and to disclose to the corporation that City Products was willing to negotiate for the sale of the Ben Franklin store if the price James Schmuck was asking was met. Plaintiff would then have had the opportunity to make a decision based upon the pertinent facts. (See *Mullaney, Wells & Co. v. Savage* (1980), 78 Ill. 2d 534, 549, 402 N.E.2d 574; *Kerrigan v. Unity Savings Association* (1974), 58 Ill. 2d 20, 28, 317 N.E.2d 39.) After this disclosure, if the corporation failed to act, defendant certainly could have taken the opportunity for himself.

Defendant breached his fiduciary duties to plaintiff by competing with plaintiff and by taking an opportunity belonging to plaintiff for himself. When a fiduciary breaches his duty of loyalty by misappropriating corporate assets or by usurping corporation opportunities, restitution can be compelled by means of a constructive trust. (*Graham v. Mimms* (1982), 111 Ill. App. 3d 751, 762, 444 N.E.2d 549.) The trial court's judgment finding that defendant breached fiduciary duties to plaintiff and misappropriated corporate assets and imposing a constructive trust is affirmed.

Affirmed.

LINDBERG, P.J., and DUNN, J., concur.