PATRICK J. FORKIN, Indiv. and on behalf of Harrison Park Development, Inc., Plaintiffs-Appellees, v. KENNETH G. COLE, SR., *et al.*, Defendants-Appellants.

Fourth District   No. 4—88—0778

Opinion filed December 21, 1989.

412

Brown, Hay & Stephens, of Springfield (Edward J. Cunningham and Emmet A. Fairfield, of counsel), for appellants.

Robert B. Goldman, and Holley, Keith & Huntley, both of Springfield, for appellees.

JUSTICE SPITZ delivered the opinion of the court:

This appeal concerns a shareholder's derivative action involving the misappropriation of corporate funds and other improper actions by directors. Defendants Kenneth G. Cole, Sr. (Cole Sr.), Kenneth G. Cole, Jr. (Cole Jr.), Gregory T. Rossi, and Harrison Park Development, Inc. (HPDI), appeal from a judgment order of the circuit court of Sangamon County entered on July 20, 1988, in favor of plaintiffs Patrick Forkin individually and on behalf of HPDI.

Prior to June 23, 1986, Cole Sr. had been engaged in real estate development, real estate sales and brokerage, natural gas sales and brokerage and related businesses through corporations owned and controlled by him. He has also been a real estate broker for some 35 years. Cole Sr. operates a sole proprietorship named Cole Development Company, which handles the real estate business. Cole Energy Development Company, Inc., handles the natural gas business, and Cole Sr. is the sole shareholder. He also owns 25% of Professional Development Corporation, which invests and holds real estate. Employed by Cole Development Company and Cole Energy Development Company were his son, Cole Jr., and his son-in-law Gregory T. Rossi (Rossi). Clifford Cole (Cole Sr.'s nephew) was employed by Cole Energy.

Plaintiff Forkin is a graduate of St. Louis University and is a certified public accountant (CPA). He was also an employee of Price, Waterhouse from 1952 to 1963. He then became vice-president of Mississippi River Corporation. For six months in 1971, he was vice-president of corporate development for Diversey Corporation, where he worked on mergers, acquisitions, and corporation management. He then became vice-president of finance of the Amedco Corporation until May 1984. At Amedco he helped bring the company public and assisted in mergers and acquisitions. When he left Amedco, he began his own firm dealing in general management, consulting, mergers, acquisitions, and corporate consulting. In 1985, he moved into the building where the Cole businesses were located. Forkin served on the board of directors previously, including the board of Amedco for 12 years and the board of Mississippi River for nine years; and when this action was below, he served on the Southern Illinois University Foundation and had for the past five years.

Prior to the organization of HPDI, Cole Sr. had an option to purchase approximately 64 acres of real estate for the purpose of developing it as a subdivision. In order to obtain the $100,000 down payment to purchase the real estate, Cole Sr. borrowed funds from Magna Bank and Security Federal as collateral for which Cole Sr. pledged his shares in Professional Development Corporation. This provided the equity required by Security Federal to make the total loan commitment of over $1,200,000. About nine months prior to the formation of HPDI, around October 1985, Forkin occupied a space in an office building housing the Cole corporations. His purpose for so doing was to associate with Cole Sr. for joint business prospects. With regard to HPDI, Forkin first became involved regarding the land-purchase option. He discussed with Cole Sr. the feasibility of a project, the timing and the market place, among other factors. Forkin drafted the option for the acquisition of the property. Shortly after the option was entered into, HPDI was formed on June 23, 1986, and Forkin prepared the documents necessary for the incorporation. The real estate was subsequently deeded to HPDI. Before the corporation took title, work had begun on clearing the land.

One hundred shares of stock in HPDI were to be issued as shown on the articles of incorporation. Cole Sr., as well as Cole Jr., Rossi, Forkin, and Clifford Cole, were named as directors in the initial minutes. These minutes did not show the actual issuance of any stock. At the initial meeting of the directors on June 23, 1986, Cole Sr. was elected president; Forkin was elected executive vice-president and secretary-treasurer; Cole Jr. was elected vice-president; and Rossi was

elected assistant secretary. According to Forkin, Cole Sr. told him who the officers and directors would be and Forkin prepared the documents accordingly. Forkin's duties included overseeing all of the financial activities of HPDI, including the reconciliation of bank accounts.

The bylaws which were adopted provide in section 6.5 that no contract or transaction between the corporation and one or more of its directors or officers shall be void or voidable solely for that reason or solely because the director or officer is present or participates in the meeting of the board of directors, if (1) the material facts as to the relationship or interest and as to the control or transaction are disclosed to or known by the board and the board in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested directors, even though the disinterested directors be less than a quorum; or (2) if the material facts as to this relationship or interest and as to the contract or transaction are disclosed or known to the stockholders entitled to vote thereon and the contract or transaction is specifically approved in good faith by vote of the stockholders; or (3) the contract or transaction is fair as to the corporation at the time it is authorized, approved or ratified, by the board or a committee thereof or the stockholders. It is also provided that interested directors may be counted in determining the presence of a quorum at a meeting of the board authorizing the contract or transaction. The HPDI corporate offices are shown to be located at the same address as the Cole businesses.

Forkin prepared and signed a subchapter "S" election (see 26 U.S.C.A. §1361 (West 1982)) for HPDI dated July 1, 1986. This subchapter "S" form shows ownership of Forkin in the amount of 12.50 shares; and stock issued to Clifford Cole (5 shares); Cole Sr. (40.75 shares); Cole Sr., as trustee for Janet Grimm (13.95 shares); Cole Jr. (13.95 shares); and Gregory and Wynn-Anne Rossi (13.85 shares).

Cole Sr. testified the decision as to share distribution was not made until December 1986, or early January 1987. The stock certificates were not actually issued until January 14, 1987. Cole Sr. paid $40.75 for his 40.75 shares. Cole Jr. stated he bought 12½ shares in December 1986 and an additional 1.45 shares in January. Clifford Cole also paid for his shares in December 1986, and received the certificate in January 1987. On the subchapter S election form dated July 1, 1986, each of the corporate shareholders signed a consent to the election, and the form indicates the shares were acquired on June 27, 1986. Clifford Cole testified he did not receive his certificate for another six or seven months.

Forkin introduced a photocopy of a stock certificate dated June 27, 1986, issued to himself for 12.5 shares, which certificate is numbered No. 1 and signed by Forkin and Cole Sr. Forkin maintained the books, records, and minutes. It was Forkin's understanding, by reason of a memorandum signed by him on August 6, 1988, that he would be receiving a 12½% interest. However, the memorandum also shows that there would be 1,000 shares issued and that he would be issued 125 shares for payment of $125. The tax documents and the checks produced show that only 100 shares of stock were issued for $1 per share. The only checks produced for the issuance of the stock were those by Cole Jr. and Rossi, both of whom produced checks dated December 2, 1986, for $12.50 for a 12½% interest in HPDI.

On July 7, 1986, Forkin and Cole Sr. signed an application for a loan of $1,255,000 to HPDI for the development of the land. In this document it was stated Cole Sr. is the "100%" owner and Forkin, Cole Jr., and Rossi are "0%" owners. The original corporate record book was introduced into evidence containing the corporate records relating to issuance of stock, and defendants' attorney was given leave to withdraw the original upon assurance that copies would be resubmitted. The record on appeal does not contain a copy of the corporate records, although the record does contain defendants' exhibits Nos. 7 and 8, the minutes of the board meeting of January 30, 1987.

The verified complaint in this case outlined the issuance of capital stock held by the various stockholders "since the inception of the corporation in 1986" and set forth the various percentages owned by each of the parties, including 12.5% by Forkin. In response to the verified complaint, defendants filed a verified answer admitting the allegation in paragraph 12 of the complaint. The answer was verified by Cole Sr., Cole Jr., Rossi, and Janet Brewer.

On July 31, 1986, Cole Sr. submitted a personal financial statement to the First National Bank of Springfield and did so again on November 30, 1986. Both showed as one of the assets the Harrison Park real estate, along with various other assets. On October 15, 1986, Cole Sr. and his wife Kathleen entered into a mortgage with the First National Bank. Among the real estate made subject to the mortgage was the Harrison Park property. According to Wayne Liken, vice-president of First National Bank in the business lending department, every time HPDI sold a lot, the bank gave a release for that lot. HPDI did not pay for the releases, but the bank did not pay for the recording of the releases. The mortgage was fully released as to Harrison Park on May 1, 1987. Cole Sr. was unsure whether HPDI or Cole Energy paid to have the releases recorded when each lot was sold.

During August through December 1986, land was being developed and subdivided, streets were being put in, sewers were being laid, and the lots were being prepared for sale. Commencing in January 1987, the lots began to be sold by Cole Development, by Cole Jr. and Rossi, as shown by plaintiffs' exhibit No. 29, which itemizes the payment of commissions to Cole Development commencing on February 4, 1987. That exhibit lists approximately 117 commission checks being paid to Cole Development from February 4, 1987, through April 31, 1988. The amounts on the checks ranged from $1,000 to more than $5,000.

At the January 30, 1987, regular board meeting, the directors discussed the corporate objectives and the corporate backing and financing needs. As a result, a resolution was adopted unanimously to authorize the following persons to sign checks from the HPDI general account at Capitol Bank & Trust Company of Springfield: not to exceed $500 to any payee or $2,500 to Cole Development from any one of Cole Sr., Forkin or Rossi; not to exceed $1,000, Cole Sr. or Forkin; and in excess of $1,000, including checks drawn to the order of an individual signer, Cole Sr. *and* Forkin.

On April 9, 1987, check No. 387 was issued to Larry and Janet Brewer for $16,829 for their interest in lot 56. This check was signed by Forkin and Cole Sr. Janet is an employee of Cole Energy who also worked for HPDI in such jobs as typing bylaws, letters of incorporation, and landowner association paperwork, issuing checks and doing closings. Cole Sr. stated lot 56 was given to Janet "for good services from the people that work for me, including those to Mr. Forkin." She was given the lot "for ongoing work, loyalty and hard work." She had received bonuses prior to that time. Because a controversy developed, a special meeting of the board of directors was held on June 29, 1987, with all directors present. At that time "it was unanimously agreed that the net proceeds from *** the sale of Lot 56, after payment of commissions, would be distributed to Janet Brewer for her services and obligations met regarding Harrison Park. This distribution is for services rendered on a contractual basis for a non employee." Cole Sr. and Cole Jr. signed the minutes of that meeting. Not only is the corporate minute book not part of the record on appeal, but these minutes did not appear as an entry in the corporate minute book until after the deposition of Cole Sr., on October 6, 1987.

Janet Brewer testified she is regularly employed by Cole Energy and is on its payroll. She, however, also worked for HPDI under the direction of Forkin. She did secretarial work primarily and assisted him in closing the lot sales. From mid-February through June 1, 1987, 90% of her time was devoted to HPDI. It was at that time that the

majority of the lots in Phase I of the development were being sold, and there were days when they would have five or six closings per day. During February, March, April, and May she was doing this work under the direction of Forkin. The checkbook and stubs were available to Forkin through July 23, 1987. Forkin would, on occasion, pre-sign checks, but whenever he did so, they were always made payable to Security Federal. Those checks were used for closings.

Brewer testified Forkin did not pre-sign the $16,829 check. He signed the check in her office, and Cole Sr.'s signature was already on the check at that time. Forkin did not question the check at that time. Subsequently, Forkin called her on a Sunday evening at her home and asked her what the check was for. She told him it was for lot 56.

Plaintiff stated that when he signed the check it was not filled in, and when he became aware of it in May 1987, he called Brewer on it. When he asked Cole Sr. about it, Cole Sr. told Forkin he gave it to her because "she worked harder around here than anyone else." Forkin showed it on the balance sheet as a credit to Cole Sr.'s withdrawals.

Cole Sr. said that Forkin did not pre-sign the check. Rossi does not recall any objection concerning the check. In fact, he recalls a board meeting where this matter was discussed. He noted that Forkin's first objection was in a June 1987 board meeting. Clifford Cole stated that everyone knew of the check. Cole Sr. testified that there are minutes in the minute book of a special meeting of the board of directors held on June 29, 1987. All directors were present, including plaintiff, and Janet Brewer as well. It was unanimously agreed that the net proceeds from the sale of lot 56 would be distributed to Janet Brewer. Cole Sr. testified he signed the minutes, and Cole Jr. attested the minutes. However, Cole Sr. admitted he is not shown in the corporation records to be secretary of the corporation, nor that he was directed to take the minutes on that particular day instead of Forkin. He also admitted there was no document in the corporate minute book reflecting a notice of special meeting of shareholders for that date. There was no individual vote regarding the ratification of the gift to Brewer.

When asked if he did not need to consult the board of directors of HPDI before making the gift to Brewer, Cole Sr. answered, "I made that decision." It was Cole Sr.'s recollection that Forkin objected to giving a check to Brewer in a board meeting held about April 9, that Brewer was asked to be excused, but the issuance of the check was approved, and Forkin went immediately and signed the check, and he did not dissent. Rossi testified that the decision was made to give

Brewer a lot of her choice in May 1986, sometime before Harrison Park was really brought into being.

During April and May 1987, Cole Sr. received early distributions from the profits that had been generated from the corporation. On April 9, 1987, Cole Development received a $14,000 check signed by plaintiff. On May 27, 1987, another check for $18,000 signed by Rossi and Cole Sr. was issued to Cole Development. On May 1, 1987, check No. 513 was issued to Cole Development for $20,000 signed by Forkin and Cole Sr. On May 8, 1987, check No. 544 was delivered to Cole Development for $120,000 signed by Rossi and Cole Sr. The $18,000 check was returned by the bank for lack of two signatures and it is noted, upon the check, "okay to pay per phone call by Patrick Forkin, per R. Chase 6/11/87." Forkin acknowledged he authorized payment to "keep peace in the family."

Forkin approved the $20,000 check to Cole Sr., dated May 1, 1987, believing it to be the only advance to Cole Sr. He had no knowledge of checks amounting to $14,000, $25,000, or $50,000 being issued in April 1987 until the second week in May 1987. Forkin testified he pre-signed checks at random, sometimes signing the check at the top leaving a space at the bottom for a second signature, sometimes signing at the bottom space leaving the top space open. Janet Brewer testified Forkin did pre-sign checks, but she did not recall preparing any pre-signed checks which were later made out to Cole Development or whether any of these particular checks were pre-signed.

Rossi testified the $120,000 payment to Cole Sr., on May 8, 1987, was authorized by the board. They had discussed the payment at a prior board meeting. He signed the check because he was under the impression that he could sign the check with Cole Sr. At the April board meeting, the directors discussed problems that had arisen because Forkin had moved out of the office and it was difficult to get him to sign checks. The directors authorized Rossi as an additional signer on checks. Forkin was present at the time this resolution was adopted. He never objected to Rossi signing checks with Cole Sr. On cross-examination, Rossi stated that at the time of signing the checks he thought he had authority to sign checks with Forkin or Cole Sr., for any amount, but he now realizes the only resolution regarding this matter provided he could sign checks exceeding $2,500 only with Forkin. On cross-examination, he also indicated that although there had been discussions of increasing check-signing authority because Forkin was inactive, that matter had never come to a vote of the board of directors.

According to Rossi, there was a meeting on May 23, 1987, at Forkin's house. At that time Forkin expressed concern that the other shareholders had not yet received their *pro rata* shares, and he wanted Cole Jr. and Rossi to support him in catching up.

Rossi testified that on May 25, 1987, the issue of distributions was again brought up at a board meeting and it was unanimously agreed that everyone would catch up with Cole Sr. In the January 1987 board meeting Cole Sr. stated he wanted his distribution first. The first time these payments were objected to was in the May meeting. There was no discussion that Cole Sr. should give the money back nor was there any such demand made upon him. These checks were distributions to Cole Sr., and according to Rossi, Forkin knew of them because Forkin reviewed every check ever written. Forkin prepared monthly financial statements showing receipts by the corporation and expenditures by the corporation. No one else prepared those statements. Forkin received the cancelled checks and bank statements. Forkin prepared a financial statement for HPDI dated May 31, 1987, in which the disputed payments were shown as distributions to Cole Sr. The record of distributions shows that through September 30, 1987, Cole Sr., received $251,000; Cole Jr., $22,292; Rossi, $22,131; Janet Grimm, $22,292; Clifford Cole, $7,990; and Forkin, $19,975. Subsequent distributions were made to all other shareholders in proportion to their interest in HPDI on January 4, 1988, January 19, 1988, February 5, 1988, March 15, 1988, and April 14, 1988. No additional distributions were made to Cole Sr., until August 14, 1988, at which time he received an additional $59,705, for a total of $310,705. The other shareholders each received distributions on those dates, so that the total for each shareholder, as of August 14, 1988, was: Cole Jr., $106,676.08; Rossi, $105,334.39; Janet Grimm, $106,676.08; Clifford Cole, $37,823.44, and Forkin received a total of $95,250.01.

After February 1987, when a cash flow began to be generated, Cole Development was paid $60,000 in administrative expenses by HPDI for the period from July 1986 through June 1987. Forkin claims these expenses were improper expenses of HPDI. Forkin claimed that this fee should have been $2,084 per month, not $5,000. The payments were to reimburse the Cole companies for Clifford Cole's salary, Brewer's salary, rent and other expenses. Cole Sr., on the other hand, claimed the proper amount to be $5,000 per month. It was during this period that Janet Brewer was spending 90% of her time on HPDI and Clifford Cole was also spending most of his time on HPDI matters. The $5,000 expense per month represented 25% of the expenses of the office of Cole Energy, where HPDI was located. Cole

Sr., in his testimony, points to a resolution of the board of January 30, 1987, wherein the board approved $5,000 per month for overhead expenses to be paid to Cole Development. Part of this was for reimbursement of Cole Energy for Clifford Cole's salary.

In the underlying complaint, plaintiffs allege payments of the administrative fees commencing with a check for $5,218 on February 19, 1987, and continuing through June 2, 1987, for 13 checks totaling $60,000. Forkin, as the secretary-treasurer signing these checks and reconciling bank statements, had knowledge of the payments and did not protest until June 1987. Rossi also stated there was a resolution adopted on June 30, 1987, to ratify the payments of $5,000 per month to Cole Development for administrative expenses until the expenses were less than 25%. This was accepted by Forkin, who was present at the meeting. Cole Jr. recalled he was the one who suggested the $2,084 figure did not cover all the administrative expenses. The 25% of the expenses was "about right" for HPDI's expenses. In connection with these expenses, Clifford Cole worked during 1987 and for three months of 1988 exclusively for HPDI. Forkin states that Cole Sr. first requested $5,000 per month after December 1986. Forkin testified he sat there in silence, but that there was never a vote.

Cole Sr. stated that, regarding the sale of the lots, the agreement was that a 7% commission would be paid, 3½% to Cole Development as a brokerage fee and 3½% to the salesman. Cole Sr. denies agreeing a total commission of only 3½% and stated that the board approved the commission on January 30, 1987. At that meeting it was agreed cooperating brokers would be paid 50% of the commission. Rossi testified the commissions were discussed and accepted on January 30, 1987, prior to the sale of any lots. He also stated it was agreed before January 30, 1987, that selling agents and cooperating agents would get 50% of the 7% commission paid to Cole Development. The commission checks were paid from February 4, 1987, through March 1988. Forkin testified he signed "numerous checks" to Cole Development for commissions, but he never thought to check what was being paid until June 1987.

As noted earlier the HPDI corporate minutes are not contained in the record on appeal. Plaintiffs suggest in their brief these minutes do not reflect that a vote was taken on that payment of the 7% real estate commission. Rossi did testify, however, that the minutes of the January 30, 1987, meeting did not appear in the record book until after July 22, 1987. Moreover, a document including an estimate of working capital requirements for HPDI represented real estate commissions would be paid at 3½% and monthly administrative, clerical,

and office expenses was $2,084. This statement was submitted to the First State Bank of Springfield on December 19, 1986, as part of an application for a loan to finance the development of HPDI assets. Ronald Wenger, vice-president and senior loan officer of First State Bank and Trust, Springfield, Illinois, testified and described documents submitted on behalf of HPDI on or about December 15, 1986, for the purpose of seeking financing. Those documents estimated HPDI's working capital requirements and listed monthly administrative expenses at $2,084 and commission as 3½%.

There was also evidence presented concerning the propriety of a real estate transaction between HPDI and Cole Sr. Cole Sr. acquired real estate referred to as "Jefferson Park" on April 28, 1977, for $25,000. At that time, the real estate consisted of six tracts of land totalling about 20 acres. His financial statements of November 30, 1986, show the property value at $50,000. Of this, 4.45 acres were sold to HPDI for $75,000. This property was appraised by John B. Clark, a realtor, for $75,000. Rossi participated in the October board meeting where it was decided to purchase Jefferson Park. Forkin wanted to have projections before it was acquired, but Rossi did not. At the October 12, 1987, meeting of the directors they voted to purchase the property. This action was ratified by the shareholders meeting on October 12, 1987. Rossi's opinion was that the property was worth $75,000. Cole Jr. also voted in favor of the transaction.

Forkin stated he objected to the purchase of Jefferson Park. He stated the transaction was originally represented to involve seven acres. The notice to the directors announcing a board meeting on October 12, 1987, refers to Jefferson Park as being approximately seven acres. He admits there was a letter from John B. Clark, a Springfield realtor, valuing the property at $75,000.

On October 12, 1987, a special board meeting was held. There was a discussion concerning Jefferson Park. Rossi indicated there were nearly a dozen individuals who were interested in building in that area. Forkin said he did not agree to putting up $200,000 on six lots for $300,000 gross. Forkin said there would not be any cash for distribution if they proceeded with that project. He also asked about cash projections. Forkin objected and moved for an independent appraisal. The motion was not seconded. Upon the vote, it was four votes to one to proceed with the project. Clark's appraisal described the property as a bluff-like knob, heavily virgin timbers and "should make a desirable development for a limited number of exclusive home sites." The property was acquired on November 13, 1987. At the time Cole Sr. conveyed the land by warranty deed, the Jefferson Park property was

encumbered by a mortgage to the First National Bank of Springfield as a result of a loan made to Cole Energy, the land was not zoned for the planned development, and the proposed rezoning has since been denied. The mortgage was released as to Jefferson Park on April 11 or 12, 1988. Rossi realized the property was encumbered when he read the title commitment, and he mentioned the fact to Cole Sr., who said the encumbrance would be removed. Rossi was not positive this conversation took place in a board meeting, nor could he recollect if any other board members were present at the conversation. The title commitment issued November 19, 1987, and it was shortly afterward that the conversation took place.

There was also testimony Cole Sr. purchased an option in another 75-acre parcel of real estate known as Grant's Ridge for developing a subdivision. Forkin argued Cole Sr. inappropriately purchased the option with monies received in the Jefferson Park transaction and failed to offer the Grant's Ridge opportunity to HPDI first.

On July 13, 1987, Forkin's attorney addressed a letter to the defendants herein asking for a special meeting and the return of all HPDI assets improperly distributed. Thereafter, this lawsuit was instituted.

Following a bench trial, the trial court issued a letter opinion on the above matter. In the letter opinion, the trial court found distributions were made to Cole Sr., and on one occasion a distribution was made to Rossi, when no distribution was made to other shareholders. The trial court further found (1) $5,000 per month was paid to Cole Development as administrative expenses; (2) the proceeds of the sale of lot 56 were paid to Janet and Larry Brewer as a gift for business services rendered by Janet Brewer to Cole Sr., and Cole Development and Cole Energy before the formation of HPDI; (3) real estate commissions were paid to Cole Development in the sum of $197,717.33; (4) Cole Sr. was the prime mover for HPDI to distribute to himself and Rossi at times when no other shareholders received a distribution of corporate funds; (5) HPDI assets were mortgaged to secure a $621,000 debt of Cole Energy Development Company; (6) Cole Sr. sold Jefferson Park acreage to HPDI for $75,000, when it had been obtained by Cole Sr. for a lesser sum of money; (7) Cole Jr. and Rossi and Clifford Cole are or have in the past been employed and received income from Cole Sr., Cole Development and Cole Energy; (8) Cole Sr. was chief executive officer of HPDI and Forkin was secretary-treasurer and executive vice-president of HPDI; (9) Cole Sr. owns 40.75 shares of HPDI and is trustee for his daughter Janet Grimm of her 13.95 shares; Rossi and his wife own 13.85 shares; Cole Jr. owns

13.95 shares; Forkin owns 12.50 shares; and Clifford Cole owns 5 shares of HPDI; (10) administrative fees of $2,084 per month are supported by the evidence presented in this case, and the sum of $5,000 per month as administrative expenses of HPDI is not supported by the evidence; (11) the evidence supports a 3½% real estate commission on sale of lots to be paid to the salesman and the evidence does not support a 3½% real estate broker's commission due Cole Development; (12) payment of $16,829 from the funds of HPDI to the Brewers was not a proper expenditure of corporate funds; (13) distribution of dividends to some shareholders and not to other shareholders is in violation of the Business Corporation Act of 1983 (BCA) (Ill. Rev. Stat. 1987, ch. 32, par. 1.01 *et seq.*); (14) Cole Sr., Cole Jr., and Rossi have not personally paid their attorney fees and costs of suit in defending this action but said fees and costs have been paid by HPDI; (15) the evidence does not support defendants' position that 100% of the stock of HPDI was owned by Cole Sr., between June 23, 1986, and January 14, 1987; (16) early distributions to Cole Sr. and Rossi were in violation of the BCA, except for the $20,000 distribution to Cole Sr. on May 1, 1987, which was consented to and approved by Forkin; and (17) Cole Sr. did not carry his burden of proof to show fairness as to the Jefferson Park transaction by demonstrating the transaction was fair.

Based on these findings, the trial court entered a written judgment order on July 20, 1988. In the order the trial court entered judgment in favor of HPDI and against Cole Sr., Cole Jr., Rossi, and Cole Development for real estate commissions in the amount of $98,858, plus simple interest at the rate of 5% in the amount of $3,797.21 from March 31, 1988, to April 30, 1988. Additional interest was calculated thereafter in the amount of $411.90 per month until entry of judgment. Judgment was also entered in favor of HPDI and against Cole Sr., Cole Jr., Rossi, and Cole Development for administrative expenses from July 1, 1986, through April 1, 1988, in the amount of $64,152, plus 5% simple interest in the amount of $3,073.95 through May 1, 1988, with additional interest calculated in the amount of $267.30 per month until the entry of judgment. Judgment was entered in favor of HPDI and against Kenneth G. Cole, Sr., and Cole Development Company for the improper distribution to Janet and Larry Brewer of $16,829, plus 5% simple interest amounting to $911.57 as of May 9, 1988, and additional interest calculated at $70.12 per month to date of judgment. Judgment was entered in favor of HPDI and against Cole Sr., Cole Jr., Rossi, and Cole Development for all of the monies spent by HPDI on the Jefferson Park

transaction in the amount of $75,000, plus additional monies the auditor finds, plus 5% simple interest of $1,562.50 as of April 30, 1988, and additional interest calculated at $312.50 per month to date of judgment. Judgment was entered in favor of Forkin and against HPDI in the amount of $55,875 for attorney fees, $1,320 paralegal fees, and $3,779 costs. The order also enjoined Cole Sr., Cole Jr., and Rossi from causing funds of HPDI to be disbursed to them or any entity in which they have a direct or indirect financial interest without the approval of a majority of disinterested directors of HPDI. And lastly, the court ordered HPDI to hire a certified public accountant to be trustee for HPDI, in order to: (1) determine proceeds from the sale of lots were properly recorded in HPDI's books of account and financial statements and deposited in HPDI's bank accounts on a timely basis; (2) determine the selling prices of lots sold were not less than HPDI's established selling prices and were in accordance with the terms of HPDI's established discount policy; (3) determine which lots remain unsold and prepare an inventory listing of such unsold lots; (4) review the cash reconciliations of HPDI from June 30, 1987, to date, including reconciliation of checking, savings, escrow and any other cash accounts; (5) determine the status and amounts of refundable deposits; (6) determine the propriety of any transactions involving the exchange or trading of lots for services rendered or other nonmonetary benefits to HPDI; (7) determine that real estate commissions did not exceed 7% of the net selling price of each lot and were paid in accordance with HPDI's established policy; (8) determine amounts paid to date by HPDI towards any non-HPDI matters or projects, including Grant's Ridge, Rolling Hills, Surf Club properties, Jefferson Park, *et cetera,* including but not limited to engineering, surveying, and payments to contractors such as, land clearance, grading, earth work, clearing, attorney fees and related costs, drawings, plat work, architectural fees, supervisory salaries to Clifford Cole, payments to Cole Energy and Cole Development, purchase options on land, and other items including costs of goods sold; (9) report on any activity or transactions which may appear to be improper or not consistent with or directly related to the development of the Harrison Park subdivision, or a conflict of interest or outside of the ordinary course of business; (10) determine the total amount of these expenditures to date and interest charges; (11) trace the proceeds of any and all funds, advances, security interests and other assets of HPDI illegally received by Cole Sr., Cole Development Company, Cole Jr., or Rossi, including but not limited to the wrongful mortgaging of HPDI assets to First National Bank on October 15, 1986, the distribution of non-*pro rata*

dividends, the wrongful sale of the Jefferson Park property, the administrative expenses, and the real estate commissions; (12) determine if any profits or other benefits were derived by any defendants from the proceeds of these; and to determine, further, if it would benefit HPDI to share in said profits or other benefits or to receive 5% interest for loss of use of said monies until such time as judgment is entered herein and the statutory judgment rate of interest shall be substituted; (13) report the determinations and findings to the trial court and the parties; and (14) in the event a constructive or resulting trust is established pursuant to this investigation, to act as trustee for said trust.

In this appeal, several issues are raised for our consideration. The first is whether Forkin is prohibited from bringing a shareholder derivative action under the "clean hands" doctrine.

█ As defendants suggest, shareholder's derivative actions are inventions of courts of equity, and even though Forkin is merely a nominal plaintiff bringing suit on behalf of HPDI, equity requires that a shareholder derivative action cannot be maintained if the nominal plaintiff has unclean hands in connection with the transactions which are the bases for the litigation or has participated or acquiesced in, or benefited from the conduct of which he now complains. *Sax v. Sax* (1977), 48 Ill. App. 3d 431, 363 N.E.2d 16; *Patient Care Services v. Segal* (1975), 32 Ill. App. 3d 1021, 337 N.E.2d 471; *Liken v. Shaffer* (N.D. Ia. 1946), 64 F. Supp. 432; 12B W. Fletcher, Cyclopedia Corporations §§5862, 5887 (1984).

Defendants do not point to any wilful conduct on the part of Forkin which would constitute unclean hands. Instead, defendants rely on evidence which, they argue, suggests Forkin acquiesced or participated in the activity of which he now complains. Defendants argue Forkin signed the checks and he was the chief financial officer of the corporation and had control of the checkbook and corporate records. Plaintiffs counter by pointing out that the trial court did not find Forkin was implicated in, acquiesced in, or participated in the wrongful action of defendants. Plaintiffs point to the evidence which indicates Forkin often signed blank checks and pre-signed checks leaving a space for a second signature.

█ This seems to be primarily a question of witness credibility, and the trial court is in a better position than is this court to assess credibility or weigh the testimony. However, signing blank checks, thereby providing the opportunity for wrongdoing, is certainly an unwise practice by such a financially knowledgeable corporate officer. Nevertheless, even though the signing of checks provided the opportu-

nity for the wrongful acts of defendants, that alone does not bar the shareholder derivative action. In *Patient Care Services, S.C.,* the court stated the mere fact the nominal plaintiff contributed to an unhappy employment environment for defendant, prompting defendant to seize the corporate business, neither justifies defendant's conduct nor involves the doctrine of unclean hands. In other words, for the derivative action to abate, the nominal plaintiff's conduct must be so at variance with principles of equity that a court of equity will not permit the action. (*Liken*, 64 F. Supp. 432.) Forkin's conduct in this case was not of such a nature as would prohibit him from bringing this cause of action.

We next consider whether the several findings of the trial court were against the manifest weight of the evidence. Within this issue, defendants raise several contentions. Defendants contend the payment of real estate commissions and reimbursements for administrative expenses to Cole Development could not have violated section 8.60 of the BCA (Ill. Rev. Stat. 1987, ch. 32, par. 8.60) because the expenditures were approved by the directors and the transactions were ratified by Forkin. Defendants also contend the Jefferson Park transaction was fair and benefited HPDI and therefore should not be set aside, but if the judgment for the amount of the purchase price of the Jefferson Park real estate is affirmed, then HPDI should be compelled to return the property. Defendants argue the complaint does not raise the issue of whether the individual defendants usurped corporate opportunities, nor does the evidence support such a finding. According to defendants, the $16,829 distribution to the Brewers was authorized by the board and approved by Forkin and the trial court's finding to the contrary is against the manifest weight of the evidence. Defendants also argue the trial court erred in finding Cole Sr. received non-*pro rata* distributions and that Cole Sr., Cole Jr., and Rossi were guilty of violating sections 6.10(a), 8.60 and 9.10 of the BCA. (Ill. Rev. Stat. 1987, ch. 32, pars. 6.10(a), 8.60, 9.10.) The defendants further contend the mortgage with the First National Bank listing the HPDI property as security for a loan to Cole Sr. should not have resulted in judgment in favor of plaintiffs because no material injury to HPDI resulted. Defendants also suggest the trial court erred in prohibiting Cole Sr., Cole Jr., and Rossi from distributing HPDI funds to themselves or any entity in which they have an interest without the approval of the majority of disinterested directors.

Defendants argue subsection (b)(2) of section 8.60 of the BCA, which provides an exception for the general rule that the party asserting the validity of a transaction has the burden of proving the

fairness, applies to the facts of this case. The exception applies if "the material facts of the transaction and the director's interest or relationship were disclosed or known to the shareholders entitled to vote and they authorized, approved, or ratified the transaction without counting the vote of any shareholder who is an interested director." (Ill. Rev. Stat. 1987, ch. 32, par. 8.60(b)(2).) For the purpose of this section, a director is "indirectly" a party to a transaction if an entity in which the director has a material financial interest or of which the director is an officer, director, or general partner is involved.

There are two theories of recovery upon which plaintiffs rely in this case. The first is that the corporate directors breached their fiduciary duty of loyalty to the corporation by misappropriating corporate assets. The second is that the corporate directors breached their fiduciary duty of loyalty to the corporation by usurping corporate opportunities. In either situation, restitution may be compelled by means of a constructive trust. *Graham v. Mimms* (1982), 111 Ill. App. 3d 751, 444 N.E.2d 549.

One of the ways plaintiffs suggest defendants, individually, or as part of a conspiracy, misappropriated corporate funds is by siphoning off monies in the form of commissions and administrative fees to Cole Development. Of the 7% commission, half was paid to a selling agent and the rest to Cole Development. In addition, $5,000 per month was paid to Cole Development for administrative expenses.

A civil conspiracy may give rise to a cause of action if two or more persons combine to accomplish a lawful purpose by unlawful means or an unlawful purpose by lawful means. The existence of a conspiracy may be inferred if parties pursue the same object by common means, one performing one part and another performing another part. *Zokoych v. Spalding* (1976), 36 Ill. App. 3d 654, 344 N.E.2d 805.

Nowhere do defendants argue that Cole Sr., Cole Jr., Rossi, or Clifford Cole had no interest in Cole Development or Cole Energy. Instead, the gist of defendants' argument is that Forkin either approved of the transactions or acquiesced therein and ratified the acts. Acquiescence occurs when a party, after hearing of an unauthorized transaction, stands by, having the benefit of the transaction if it proves favorable or choosing to reject the transaction should it prove unfavorable. Such acquiescence amounts to a ratification of the unauthorized transaction if the circumstances give rise to a duty to repudiate the transaction. (*Freeport Journal-Standard Publishing Co. v. Frederic W. Ziv Co.* (1952), 345 Ill. App. 337, 103 N.E.2d 153.) Defendants fail to demonstrate how Forkin could benefit from the payment of excessive commissions and administrative fees.

■ Defendants suggest the board approved the commissions and $5,000-per-month administrative fees at the January 30, 1987, board meeting, but Forkin made no written objection until July 13, 1987, even though Forkin signed many of the checks. The trial court must have found this was not acquiescence or ratification. The only question is whether the trial court's finding is against the manifest weight of the evidence. The finding would be against the manifest weight of the evidence if the opposite result were clearly evident from a review of the facts. (*Stone v. City of Arcola* (1989), 181 Ill. App. 3d 513, 536 N.E.2d 1329.) Defendants also argue the trial court's finding that adequate reimbursement for administrative expenses would amount to $2,084 per month is against the manifest weight of the evidence since Clifford Cole was paid $20,800 per year by Cole Energy but worked exclusively on HPDI projects in 1987 and through March 1988. In addition, Brewer testified she spent 30% to 40% of her time on HPDI projects for the first seven months. There were, in addition, utilities, telephone, office space, and other expenses. However, the trial court is not obligated to believe their testimony concerning the amount of time spent on HPDI projects, especially in light of documents submitted to a bank indicating a monthly administrative expense of $2,084 and payment of commissions at $3\frac{1}{2}$%. As a result, the trial court's determination as to commissions and administrative fees is not against the manifest weight of the evidence.

Regarding the Jefferson Park transaction, defendants suggest it was fair to HPDI. Plaintiffs, of course, disagree. Defendants rely on that portion of section 8.60 of the BCA which provides that if a transaction is fair to the corporation at the time it is authorized, approved, or ratified, the fact a director is directly or indirectly a party is not grounds for invalidating the transaction. Ill. Rev. Stat. 1987, ch. 32, par. 8.60.

Cole Sr. purchased the real estate (about 20 acres) in 1977 for $25,000. On October 17, 1987, HPDI entered into a contract to purchase it for $75,000. There was an appraisal which set the market value of the property at $75,000. In this transaction, neither Cole Jr., Rossi, nor Clifford Cole, who gave his proxy, was directly or indirectly a party, unless the civil conspiracy theory is employed. But if the transaction was fair to HPDI, it still is not actionable.

■ There is some evidence Cole Sr. represented the property to include seven acres, rather than the actual 4.45 acres, and even though the land was conveyed by warranty deed, it later appeared the property was subject to a mortgage to the First National Bank of Springfield to secure loans to Cole Sr.'s other companies. Nor was the

property zoned for the development anticipated when the property was sold to HPDI. As a result, the trial court's finding that the transaction was not fair to HPDI is not against the manifest weight of the evidence. The burden of proving the transaction to have been fair and that the director exercised good faith rests with the corporate director who transacted business with the corporation. (*Romanik v. Lurie Home Supply Center, Inc.* (1982), 105 Ill. App. 3d 1118, 435 N.E.2d 712; *Zokoych*, 36 Ill. App. 3d 654, 344 N.E.2d 805.) It would seem that several material facts pertinent to the transaction were not disclosed at the time the board voted on the transaction, including the existence of the mortgage, in violation of section 8.60 of the BCA. Moreover, if the companies owned by Cole Sr. would benefit from the transaction to the extent of a release of the mortgage, then Cole Jr., Rossi and Clifford Cole are not disinterested directors. Additionally, the trial court could properly find from the evidence that Cole Sr., Cole Jr., Rossi, and Clifford Cole coordinated their efforts in getting many of these transactions approved by the HPDI board.

Defendants argue that if this court affirms the trial court as to the Jefferson Park transaction, then the proper remedy is rescission of the sale, repayment of the $75,000 to HPDI, and return of the property. Forkin stipulates to a return of the property upon repayment to HPDI of $75,000. To that extent, the order of the trial court will be reversed and the cause remanded for modification of the order.

■ The next question to be determined is whether plaintiffs have pleaded and proved usurpation of corporate opportunities by Cole Sr., Cole Jr., and Rossi. Plaintiffs and defendants agree on the applicable principles of law. As a fiduciary, a director owes a duty of loyalty to the corporation and its shareholders, and one of the ways in which the director may breach this fiduciary duty is to take advantage of a business opportunity which may be considered to belong to the corporation. (*Lindenhurst Drugs, Inc. v. Becker* (1987), 154 Ill. App. 3d 61, 506 N.E.2d 645.) Just as when a director misappropriates corporate assets, the remedy for usurping corporate opportunities is restitution compelled by means of a constructive trust. *Graham*, 111 Ill. App. 3d 751, 444 N.E.2d 549.

■ A corporate opportunity exists when the proposed activity is reasonably incident to the present or prospective business of the corporation and is an activity in which the corporation has the capacity to engage. (*Lindenhurst Drugs, Inc.*, 154 Ill. App. 3d 61, 506 N.E.2d 645.) If the activity is a corporate opportunity, then the corporation must be given the full opportunity to decide whether to enter into the activity, based on a full disclosure of pertinent facts. Directors who

fail to so disclose or to tender the opportunity to the corporation may not exploit the opportunity for their own benefit. (*Kerrigan v. Unity Savings Association* (1974), 58 Ill. 2d 20, 317 N.E.2d 39.) If the corporation has rejected the opportunity or is not in a position to take it, no fiduciary duty is breached by the director taking the opportunity for himself. *Northwestern Terra Cotta Corp. v. Wilson* (1966), 74 Ill. App. 2d 38, 219 N.E.2d 860; 3 W. Fletcher, Cyclopedia Corporations §862 (1984); Henn & Alexander, Laws of Corporations, §237 (3d ed. 1983).

In this case, plaintiffs contend the evidence establishes Cole Sr. usurped a corporate opportunity by acquiring an option on 75 acres of real property known as Grant's Ridge. Plaintiffs point to Cole Sr.'s testimony that the option was not offered to HPDI. Plaintiffs also point to the option date of November 24, 1987, and Cole Sr.'s testimony that he might have used funds received from HPDI in the Jefferson Park transaction to acquire the Grant's Ridge option.

Defendants argue usurpation of a corporate opportunity was never pleaded and, in any event, it is not established by the evidence. Defendants maintain there is no evidence corporate funds were used, that Cole Sr. learned of the Grant's Ridge opportunity in his capacity as director or officer of HPDI, or that HPDI was financially capable of acquiring Grant's Ridge. Defendants also point to Cole Sr. being in the real estate development business outside of HPDI.

The parties seem to overlook the fact that the order of the circuit court does not enter judgment against defendants for usurpation of a corporate opportunity. The tracing of funds into Cole Sr.'s involvement in the Grant's Ridge transaction was based not on the usurpation of a corporate opportunity, but on the possible use therein of misappropriated funds derived by Cole Sr. in the Jefferson Park transaction. As a result, a reversal of the trial court for this reason is not warranted.

As to the payment to Brewer, defendants claim the board approved the transaction and Forkin signed the check. There was evidence Forkin objected to the transaction, and Forkin stated he pre-signed the check. It is admitted lot 56, which Brewer was given and sold back to HPDI, was given to Brewer for past services to Cole Energy. If Cole Energy wanted to present a gift to its employee, Cole Energy should have bought the lot first, and if Brewer did not want the lot, Cole Energy should have purchased it from her.

■ Next defendants argue the trial court erred in finding that non-*pro rata* distributions were made to Cole Sr. As is pointed out in

*Cratty v. Peoria Law Library Association* (1906), 219 Ill. 516, 76 N.E. 707, equity may prevent discrimination or unfair distribution of dividends among shareholders of the same class. Defendants contend that the proper remedy is not a derivative action but an action of the aggrieved shareholder. While Forkin did sue individually, the judgment of the trial court is not entered in favor of Forkin, but is entered in favor of HPDI instead. Defendants also maintain that Forkin received his proportionate share as of the date of the trial, that Forkin acquiesced in that early distribution to Cole Sr., and there is no need to trace the funds distributed to Cole Sr. Nevertheless, it is obvious Cole Sr. received a disproportionate share of distributions early on. The judgment is justified on the theory that the trial court could properly find the distributions were not intended to be dividend payments, but were in fact misappropriations of corporate funds. The argument that Forkin has now received his proportionate share of the profits and, therefore, cannot now complain ignores the facts that (1) the corporation lacked the use of this money for some time and (2) Cole Sr. had the use and benefit of funds to which he did not have an equitable right.

It is a question of fact and credibility whether Forkin acquiesced in these distributions, and the trial court was certainly in a better position than is this court to assess credibility and weigh the evidence. As a result, we cannot say the finding of the trial court was against the manifest weight of the evidence.

Defendants next contend the mortgage of the HPDI property to the First National Bank as security for a loan to Cole Sr. should not have resulted in judgment against Cole Sr., in that no material loss occurred to HPDI. Plaintiffs counter by pointing out that there may have been no charges for the preparation of the partial releases given for each lot as they were sold, but it was probably HPDI that paid for the filing of the releases. More importantly, by encumbering the HPDI asset, Cole Sr. used a corporate asset for his own personal benefit. It also arguably could have prevented HPDI from taking advantage of a corporate opportunity had one arisen. The misappropriation of a corporate asset provided an advantage to Cole Sr.

Defendants' final argument is that the trial court erred in prohibiting Cole Sr., Cole Jr., and Rossi from distributing HPDI funds to themselves or any entity in which they have an interest without the approval of the majority of disinterested directors. Defendants complain this injunction gives Forkin veto power over the corporate operations. They also complain the act enjoined is not

delineated with sufficient particularity to allow defendants to understand what is forbidden and to enable enforcement and that the scope of the injunction exceeds what is reasonably required to protect Forkin and HPDI. (*Kolstad v. Rankin* (1989), 179 Ill. App. 3d 1022, 534 N.E.2d 1373; *Streif v. Bovinette* (1980), 88 Ill. App. 3d 1079, 411 N.E.2d 341; *Illinois Power Co. v. Latham* (1973), 15 Ill. App. 3d 156, 303 N.E.2d 448.) However, the injunction seems to be merely a restatement of section 8.60 of the BCA, which requires a majority vote of disinterested shareholders to approve a transaction involving a director who is directly or indirectly involved in the transaction. For this reason, it is not vague or overbroad and is not against the manifest weight of the evidence.

■■■ The next issue to be considered is whether the trial court properly ordered the tracing of all funds and advances received by defendants. Defendants argue the trial court cannot award a money judgment and order an accounting, requiring that the use of the misapplied funds be traced. However, as this opinion earlier pointed out, HPDI is not only entitled to return of the misappropriated funds, but is also entitled to the proceeds defendants received from the use thereof, as a constructive trust. Without tracing the funds, the court cannot ascertain the amount of proceeds from the use of misappropriated assets to be returned to HPDI. Such an accounting is proper equitable relief.

Defendants also challenge the trial court's rulings as to attorney fees. Defendants raise two contentions concerning attorney fees. The first contention is the award of $55,875 attorney fees, $3,779 costs, and $1,320 paralegal fees in favor of Forkin and against HPDI was not supported by the evidence. Defendants also contend the court erred in awarding a judgment to HPDI for attorney fees paid by HPDI to defend Cole Sr., Cole Jr., and Rossi.

■■■ Defendants admit that section 8.75(e) of the BCA (Ill. Rev. Stat. 1987, ch. 32, par. 8.75(e)) provides that a corporation may indemnify a person for fees actually incurred in connection with defending a suit if that person is acting in good faith and not in opposition to corporate best interests. Since it has already been determined the trial court properly found defendants had not been acting in good faith and had acted in opposition to corporate best interest, the award of attorney fees to HPDI for fees paid to defend these individual defendants was proper.

As to the question of whether the trial court properly awarded attorney fees to Forkin, in *Board of Managers, Colony West Townhome Owners Association v. Bucalo* (1979), 69 Ill. App. 3d 287,

387 N.E.2d 53, a small claims action for $598 attorney fees, the trial court was found to have improperly allowed the fees solely on the bases of the petition and the affidavit attached thereto, without evidence as to the hours spent or other justification to establish the fees required were in a reasonable amount. Forkin states a plaintiff in a derivative action is entitled to attorney fees, citing *Romanik* (105 Ill. App. 3d 1118, 435 N.E.2d 712), and *Ross v. 311 North Central Avenue Building Corp.* (1970), 130 Ill. App. 2d 336, 264 N.E.2d 406. However, neither case suggests the trial court may award attorney fees without evidence therefor. Here, defendants complain that no evidence was presented concerning the time expended, the hourly rate charged, the work performed, or the skill and expertise of the attorneys involved. As *Lyons Brothers Lumber & Fuel Co. v. Shepherd* (1980), 81 Ill. App. 3d 213, 400 N.E.2d 975, points out, these are factors which are ordinarily considered in ascertaining the propriety of an award of attorney fees. Forkin relies on the fact the trial court and opposing counsel received a petition for attorney fees, which should have been filed of record herein and might have been attached as an exhibit to the judgment order in this case, but no such petition is contained in the record on appeal. However, the *Board of Managers, Colony West Townhome Owners Association* case suggests the attorney's affidavit alone cannot be the basis for the award.

Plaintiffs filed a motion to amend the record by adding the petition for attorney fees which was inadvertently omitted from the trial court's order; this court denied the motion without prejudice to plaintiffs seeking appropriate relief under Supreme Court Rule 329 (107 Ill. 2d R. 329) from the trial court. At oral argument, Forkin also requested that, if he prevails on appeal, the cause be remanded to the trial court for assessment of attorney fees on appeal. Plaintiff argues defendants have waived consideration of this issue on appeal by failing to object when two proposed judgment orders including attorney fees were submitted to the trial court, even though the defendants did raise this issue in the defendants' post-trial motion.

■■ ■ The raising of the issue of Forkin's attorney fees in the post-trial motion sufficiently preserved the issue for appeal. And since the cause will be remanded for a determination of plaintiff Forkin's attorney fees on appeal, it does not seem an undue hardship to require the trial court to reconsider the entire award of attorney fees to Forkin. While the trial court observed the expertise of counsel, observed the nature of the case and the attorney's work, observed the time expended in trial, and could have determined the

reasonableness of the time expended preparatory to trial by reference to the nature of the case, the nature and extent of the evidence, and resort to the common law record, even if the petition for attorney fees sets forth the hourly rate for the attorney, there is no "evidence" upon which the trial court could find the rate to be reasonable. Because the record does not support the finding awarding fees in this case, although there is no reason to suggest they are unreasonable, the cause will be reversed and remanded as to attorney fees.

■■■ The final issue to be considered is whether the trial court properly awarded prejudgment interest to plaintiffs. Both plaintiffs and defendants rely on the case of *City of Springfield v. Allphin* (1980), 82 Ill. 2d 571, 413 N.E.2d 394, which provided that prejudgment interest may be assessed as part of a judgment if warranted in equity. Defendants argue simply that the payments were not secret, but made openly, with Forkin's assent or acquiescence and defendants' conduct was not wilful, wanton, or fraudulent. However, this court has decided the trial court properly determined defendants misappropriated corporate assets and in some cases conspired to achieve those results. Accordingly, equity warrants the assessment of prejudgment interest as part of the judgment.

For the foregoing reasons, the judgment of the circuit court of Sangamon County is affirmed in part, reversed in part and remanded to allow for modification of the trial court's order to provide for the return of Jefferson Park real estate in the event the judgment thereon is satisfied and to conduct further proceedings to establish the reasonableness of plaintiff's attorney fees. In all other respects, the judgment is affirmed.

Affirmed in part; reversed in part and remanded with directions.

STEIGMANN and McCULLOUGH, JJ., concur.